## WILMINGTON TRANSP. CO. v. STANDARD OIL CO. et al.

### No. 6494.

Circuit Court of Appeals, Ninth Circuit.

Nov. 23, 1931.

H. F. Prince, Gibson, Dunn & Crutcher, and Keith Bullitt, all of Los Angeles, Cal., for appellant.

H. R. Kelly, John C. McHose, and Young, Lillick, Olson, Graham & Kelly, all of Los Angeles, Cal., for appellee Standard Oil Co.

W. I. Gilbert and Kenneth Keeper, both of Los Angeles, Cal., for appellee Southern Pac. Co.

Before WILBUR and SAWTELLE, Circuit Judges, and JAMES, District Judge.

WILBUR, Circuit Judge.

This appeal is taken by the Wilmington Transportation Company from an interlocu-tory decree in admiralty adjudging appellant solely responsible for a collision between the tanker W. S. Miller owned by Standard Oil Company, appellee, and a drawbridge owned by the Southern Pacific Company across a navigable channel in Los Angeles Harbor leading from the turning basin through the drawbridge in question to the West Basin.

At the time of the collision the oil tanker was being towed by two tugs belonging to Wilmington Transportation Company, and the pilot of the latter company upon the bridge of the tanker was in charge of the vessels at the time of the collision. The oil tanker was 435 feet long, with 56-foot beam. The W. S. Miller had partly passed through the draw when the upper portion of the mid-ship section of the ship, about 140 feet abaft the bow on the port side, came in contact with the lift span of the bridge.

The appellant contends that the collision resulted from the fact that the clearance of 100 feet required by the orders of the Secretary of War was not provided, either because the lift span was not raised sufficiently high to give that clearance or because the dolphins were placed too near the pier, or both. Inasmuch as it is claimed that the physical facts demonstrate that the collision could not have occurred if the bridge had been constructed in accordance with the direction of the Secretary of War, and the lift span had been raised to the 82 degree limit so required, we will state in more detail the circumstances surrounding the collision.

The drawbridge is of the bascule or jack-knife type, pivoted on the south side of the channel leading from the turning basin to the West Basin. The single lift span is raised by electric motors. The lift span is so constructed that it can be raised so that the base of the span makes an angle of 85 degrees with the horizontal, while the requirement of the Secretary of War was for an angle of 82 degrees, thus when fully raised giving greater clearance than required. The electric control of the bridge is so constructed that, when the bridge had been raised to 76 degrees, that is, within 14 degrees of the vertical, it automatically stops. In order to get the additional lift of 9 degrees, it is necessary that the bridge tender turn on the electric current which has been automatically broken, and then control the bridge until it reaches its extreme height of 85 degrees. Two dolphins of 12 piles each are placed on the channel side of the pier supporting the lift span, according to the directions of the Sec-

retary of War. The center of these dolphins was to be 14' 6" or 14' 8" from the center line of the pier. Nine of these piles were to be driven so that the center of each one thereof was on the circumference of a circle 6 feet in diameter. The other three piles were to be driven inside this circle. The top of the dolphin piles were lashed together with wire rope of ¾" diameter. Thus, if a vessel should come in contact with the bottom of the dolphin, its side at that point would be 14' 6" plus 3' plus the radius of the outer piles, say 6 inches, or a total of 15' 2" from the center line of the pier. If the point of contact were nearer the surface, it would be somewhat less owing to the fact that the dolphin was constructed with slanting sides as indicated. According to the drawing furnished to the Southern Pacific Company by the Secretary of War as a part of the directions for constructing the dolphins and bridge, a vertical line drawn from the outer side of the dolphin at the bottom of the channel would intersect the lift span when raised to 82 degrees at a point 100 feet from the mean low water line, or 135 feet above the bottom. The lift span was 160 feet long. At the time of the collision there was slack high water 7 feet above mean low water. The W. S. Miller was drawing from 3 to 5 feet forward and 15 to 16 feet aft, and its draft at the point of impact was approximately 7 or 8 feet; that is to say, the entire vessel at the point of impact was above mean low water line or a line one foot below it. The point of impact is indicated on the lift span of the bridge by the indentation and bending of plates, and is indicated upon the vessel by the crushing in of some of the superstructure above the upper bridge. Both points are shown by photographic exhibits. The exact point of impact upon the bridge can be ascertained within a few inches, while the corresponding point of impact upon the ship may vary several feet; that is to say, the physical results of the impact, the crushing in of the superstructure might have resulted from an impact at any point at or above the upper deck and at or below the flying bridge, which were 7' 6" apart. The point of impact indicated on the lift span of the bridge is 52 feet above the mean low water line with the lift span raised 82 degrees, and thus 45 feet above the highwater line at the time of collision, but 52 or 53 feet above the keel of the W. S. Miller. The exact point of collision on the W. S. Miller above the water line was variously estimated by the witnesses at from 40 to 50 feet. The Southern Pacific Company, appellee, in its computation, estimates the point of impact on

the vessel at about 49 feet above the water line; that is, at the flying bridge. The appellant estimates the point of impact upon the vessel to be from 42 to 45 feet, or about the height of the navigating bridge, above the water level. The vessel at the point of impact was practically flat bottomed, its sides straight lined, but tumbling in slightly (about 18 inches in all) from the vertical. Appellant thus states its position:

"Assuming the lift span fully raised and the dolphins correctly placed, the extreme upper corner of a vessel with perpendicular sides extending 50 feet above the mean low water line should miss the lift span by approximately 7 feet. In the present case, there was a collision at a point somewhere around 50 feet above the mean low water line. That fact in itself, irrespective of figures as to the point of collision on the vessel, her draft, her tumblehome, et cetera, is, we believe, conclusive that the ship did not have the benefit of the specified clearance.

"In the final analysis, we submit that the drawing, Exhibit H, conclusively shows that if the bridge had been constructed and the dolphins located as shown, the 'W. S. Miller' should have had 100 feet of overhead clearance with the lift span fully raised. The mere fact that the vessel struck the lift span at a point only half this height, seems to us conclusive evidence that the lift span was not fully raised and/or the dolphins not properly placed. If so, under the authority of The Kard, Geo. H. Ingalls, and Norfolk-Berkley cases, referred to in Wilmington Transportation Company's brief, liability for the collision should rest solely with Southern Pacific Company."

The appellee's position is thus stated:

"The appellee, Southern Pacific Company, contends that the top of the vessel as reflected by the exhibit represents a distance of 56 feet from the bottom or mean low water line. This is determined by libelant's Exhibit 'J', which is a blueprint showing a cross section of the 'W. S. Miller.' According to the scale on that exhibit, the distance from the bottom of the boat to the flying bridge deck and which is the point where the impact occurred, is 56 feet. There is a railing around the flying bridge deck, which is approximately 3 feet high, and this would make a distance from the bottom of the boat to the top of that railing of 59 feet.

"The testimony develops that there was a seven foot tide or water line at the time of collision. From the water line, therefore, to the flying bridge would be 49 feet and from

789

the water line to the top of the railing would be 52 feet. Libelant's Exhibit 'I' is a photograph showing the point of collision, and it appears from that photograph, and as will be more fully reflected by the testimony, that the point of collision was approximately at the deck of the flying bridge. The railing around the flying bridge does not appear to have received the first blow. The deck at the upper bridge or which is the first deck below the flying bridge shows serious damage for the reason that it was at this point that the upper part of the vessel was laid back from the impact.

"By referring to Wilmington Transportation Company Exhibit No. 1, which was the exhibit prepared by the witness Lamby, it will disclose that there is a distance from the water line to the point of collision on the drawbridge of 41 feet. It will be seen, therefore, that there is a large discrepancy between the point of impact on the draw bridge and the point of impact on the vessel. For illustration, if the railing on the flying bridge first received the impact, this would be 52 feet above the water line, while the point of impact on the draw bridge is only 41 feet. If the deck of the flying bridge received the impact the distance from the water line to that point is 49 feet as opposed to the 41 foot distance on the draw bridge.

"From these measurements it is clearly established that the theoretical basis of counsel's appeal is not supported by the testimony in the case, nor by the exhibits reflecting the actual measurements of the vessel itself.

"Therefore, if it is shown that any of the measurements which were used in the theoretical calculations by appellant are erroneous, then their position is untenable and not supported by the evidence in the case."

It will be observed that the contention of the appellee would result in the conclusion that the two points of the impact did not come in contact. This is a manifest absurdity. Upon this absurdity the contention is raised that the appellant's figures are necessarily incorrect. The difficulty with this contention is that the dimensions of the vessel and of the bridge are established beyond peradventure of doubt.

We must assume in any analysis of the facts that some point on this vessel at or above the upper bridge and at or below the flying bridge came in contact with the lift span at the point indicated by the deformation thereof caused by the collision, and consider the evidence in the case upon that basis. The difficulty with the contentions of the

Southern Pacific Company is that they prove that the admitted collision did not in fact occur, for, if the dolphins were placed as required by the order of the Secretary of War, and the bridge was raised to 85 degrees, the collision was impossible, unless, as is suggested by the appellee, there was a heavy list to port due to the sudden squall of wind, which threw the vessel against the bridge. All the testimony is to the effect that there was no list to port. There is testimony of two observers from the shore that the bridge span was not lifted to its full height, but remained stationary at about 15 degrees with the vertical. It will be observed that this is about the point at which the bridge would stop automatically. The bridge tender who testified in the case, anticipated the impending collision and fled from his post at the control of the lifting machinery, fearing with good reason, that as the result of the collision the lift span might fall upon the control house in which he was situated. He testified, however, that before fleeing he had raised the bridge to its utmost height.

At the time of the trial five years after the accident, the dolphins, although frequently repaired, were in the same relative position as in 1925 at the time of the accident. The dolphins were so placed that the center line of each was 12 feet from the center line of the cement pier supporting the lift span; that is to say, they were 2' 8", or, as appellant claims, 2' 6", nearer than called for by the order of the Secretary of War as shown by the drawing furnished by him.

There is testimony to the effect that the vessel did not come in contact with the dolphins, and, to the contrary, that it did. In view of this conflicting testimony given by the eyewitnesses, we must assume the most favorable view to the appellees and conclude that there was a collision between the vessel and the dolphin sufficiently severe to injure the dolphin.

If we assume that the lift span of the bridge was raised only 76 degrees from the horizontal point at which it automatically stopped, we find from the drawing above mentioned that the point of collision upon the bridge would be almost immediately over the center line of the dolphin if placed as required by the drawing of the Secretary of War. That is to say, if we assume, in accordance with the testimony, that the dolphin at the time of the collision was in the same place it was at the time of the trial, the face toward the channel would be almost exactly where the center line of the dolphin was required to be

by the drawing of the Secretary of War; that is, 14′ 6″ or 14′ 8″ from the center line of the pier. If we assume the lift span of the bridge to have been raised to an angle of 76 degrees and no more at the time of the accident, the point of the impact on the bridge would be about 39 feet above the high-tide line, or 46 feet above the keel of the vessel, according to the drawing above mentioned. If the point of impact on the lift span of the bridge was 39 feet above the water line at the time of the collision, it would, of course, follow that the point of impact upon the ship would be the same height above the water line. This would place the point of impact at about the upper bridge deck, which was 40 feet above the water line. It will be observed that the facts thus far stated cannot be gainsaid. The photograph of the injury to the ship seems to indicate that the collision did occur at about this point.

Warren L. Turnquist, captain of the tow boat Bedford belonging to the Los Angeles Shipbuilding & Dry Dock Corporation, saw the collision from a distance of about 350 yards. He was familiar with the drawbridge, and testified that at the time of the collision the bridge was in the neighborhood of 15 degrees with the vertical. He testified that at the time of collision the bridge was not "as usual." He testified that the port wing of the navigating bridge (40 feet above the water line) on the W. S. Miller struck the drawbridge. When asked, "Can you state approximately where it struck the drawbridge?" he stated, "Why, from the height of the ship to the water, approximately 40 feet." "Q. In other words, the ship struck the lifted draw span? A. At the height of the ship, at the height of the wing of the bridge, it is 40 feet. I don't know how high it would be at the bridge itself."

Oscar F. Vera, whose deposition was taken by the appellant, was second officer of the W. S. Miller at the time of the collision. He had been through the drawbridge over forty times prior to the collision. He testified that the W. S. Miller was on an even keel at the time of the collision; that the lift span stopped at an angle of 15 or 20 degrees; that he was aft of the navigating bridge in front of the poop when he saw that the collision was imminent; that, if he had remained in that position, he would have been struck. He testified as follows with reference to the point of impact: "Q. What part of the Miller came in contact with the bridge? A. Let's see, about where the light house is, about 41 feet high from the water line."

G. A. Johnson, master mariner employed on the W. S. Miller as first mate at the time of the collision, testified that he had gone through this draw about 50 times; that the W. S. Miller had no list at the time of the collision; that at the time of the collision he estimated that the lift span was raised to about 15 degrees with the vertical; that the upper part of the flying bridge (7′ 6″ above the upper deck) was the point of contact, (i. e., 47′ 6″ above the water line); he estimated that the distance between the dolphins and the concrete abutment of the bridge was 4 to 6 feet, which would accord with the above-mentioned drawing; he estimated the diameter of the dolphins to be 4 feet. He was asked:

"Do you know approximately the height of the bridge of the W. S. Miller above the water at the time of that collision? A. Above the water? Q. Yes. A. Well, I would say around 45 feet; between 40 and 45 feet, from the edge of the water."

Capt. Alfred C. Becher, who was the pilot of the Miller at the time of the accident, testified that he would judge the point of collision on the Miller's bridge was 50 feet above the water line.

With reference to the position of the dolphins at the time of the accident, it should also be stated that the method of replacement was by removing the damaged pile and replacing it with a new one, so that, unless there was a complete replacement of the dolphin between the time of the accident and the time of the trial, the dolphin was 2′ 8″, or 2′ 6″ nearer the abutment of the bridge than it should have been. As we have already pointed out, if we assume the bridge was raised to the height of 76 degrees only, and that the dolphin was in the position testified to by the civil engineer of the Southern Pacific Company with its center 12 feet from the center of the abutment, and assume that the sides of the ship were vertical, the point of impact on both the ship and the bridge would be that shown by the evidence to have been the actual point of contact, i. e., a point about 40 feet above the water line, for we must assume that the point of contact on the ship was at a point above the water line equal to that of the point of contact on the bridge; that is, about 40 feet. Therefore, on this hypothesis, that the drawbridge was raised 76 degrees, we reject the evidence which varied materially from this height of 40 feet as a point of impact on the ship. If the dolphins were further from the position required by the Secretary of War, that is to

say, if they were closer to the abutment, it would be possible for a collision to occur between the ship and the lift span. For instance, if we assume that the dolphin was in immediate contact with the concrete surface of the abutment at the time of the collision or was forced into contact by the collision, it would be possible for the vessel to come in contact with the bridge at a point about 40 feet above the water line, particularly in view of the tumble home of 18″. But the evidence as a whole is clearly to the effect that the dolphins were not so far out of line or forced so far over as this, on the contrary, that they remained in substantially the position they were at the time of the impact, some of the witnesses testifying that the vessel did not even strike the dolphins, while others were of the opinion that the side of the vessel collided with the dolphins, and that the skin of the ship was in contact with the dolphins before and at the time of the collision. The evidence, on the whole, demonstrates that, if the dolphins were properly placed, that is, with the center line 14′ 6″ or 14′ 8″ from the center line of the abutment as required by the Secretary of War, the collision could not have occurred, but that, if the dolphins were misplaced at the time of the collision to the amount that they were misplaced at the time of the trial, 2′ 8″ or 2′ 6″ as the testimony shows, and the bridge span was lifted to 76 degrees only, the collision would have occurred exactly as it did occur. We assume in this that the impact of the collision might have forced the dolphins over a distance equivalent to the tumble home (18″). The evidence is clear that the collision would have been impossible if the bridge span had been lifted to 82 degrees, and if, as must be conceded, the dolphins were placed sufficiently far from the face of the concrete pier so as to show clear water between the dolphin and that surface. To state the matter more tersely, it is clear that, if the bridge and dolphins had been constructed with a clearance of 100 feet as indicated and required by the Secretary of War, a vessel no higher than fifty feet above the water line could not have collided with the lift span when it was fully raised.

It is conceded in the briefs, and was conceded at the argument, that, if the proximate cause of the injury to the W. S. Miller was failure to raise the draw to its extreme elevation or to construct the dolphin as required by the Secretary of War, the Southern Pacific Company would be solely responsible for the accident. As the point is conceded, we merely call attention to the au-thorities cited by the appellant, 33 USCA §§ 401, 403, 491, 494; Clement v. Metropolitan West Side El. R. Co. (C. C. A.) 123 F. 271; The Kard (D. C.) 38 F.(2d) 844; The Geo. H. Ingalls (C. C. A.) 47 F.(2d) 1017; U. S. v. Norfolk-Berkley Bridge Corp. (D. C.) 29 F.(2d) 115; The Eurana, [1931] A. C. 300, 39 L. R. 1; Reichert v. Long Island R. Co. (C. C. A.) 194 F. 407; The Starke (D. C.) 182 F. 498; Southern Transportation Co. v. Philadelphia, B. & W. R. Co. (D. C.) 196 F. 548, and F. S. Royster Guano Co. v. Outten (C. C. A.) 266 F. 484.

The decree is reversed, with instructions to enter decree holding the Southern Pacific Company solely responsible for the damages suffered by the W. S. Miller, such damages to be ascertained as provided in the decree.