348 F.Supp. 549 (1972)
In re Complaint of the GREAT LAKES TOWING COMPANY, as Owner of the TUGS ARIZONA and JOSEPH H. CALLAN, for Exoneration from or Limitation of Liability.
CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, a corporation, et al.
v.
MOTORSHIP BUKO MARU, her engines, tackle, apparel and furniture, et al., Defendants.
Nos. 70 C 2259, 70 C 1837.
United States District Court, N. D. Illinois, E. D.
March 2, 1972.
*550 C. Roy Peterson, Lord, Bissell & Brook, John McMurray, Bradley, Eaton, Jackman & McGovern, John Gobel, Hackbert, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for plaintiffs.
McBride, Baker, Wienke & Schlosser (Harvey Wienke), Chicago, Ill., for defendants.

DECISION
McMILLEN, District Judge.
These cases arise out of a collision of the M. S. Buko Maru with a single leaf bascule bridge of the Chicago and Western Indiana Railroad. When the collision occurred, the Buko Maru was being assisted up the Calumet River from Lake Michigan to Lake Calumet by two tugs of the Great Lakes Towing Company. The towing company filed a libel (70 C 2259) against the owners of the bridge and of the ship, seeking to be exonerated from any liability on the ground that its two vessels were properly operated (46 U.S.C. § 193 et seq.). We find this complaint should be granted.
In a separate but merged action, the Chicago and Western Railroad Company libelled the shipowner for damage to the bascule bridge (70 C 1837). The issue of liability has been tried separately from the issue of damages. Applying the rules of Admiralty (see 46 U.S.C. § 740), we find that the ship was at fault for this collision and its owner must respond in damages to the plaintiff railroad. It follows from the foregoing that the cross-libel of the steamship company for damages to its vessel must be denied.
The collision occurred in the dark of night on July 13, 1970. The resulting problem is to reconstruct just what occurred to cause the collision as the ship was passing through the bridge draw. This problem is complicated by the fact that each of the several occurrence witnesses could see only their own small segment of the action. In order to help put the pieces of the puzzle together, the parties presented several expert engineering witnesses, but the experts disagreed among themselves. The facts and circumstances make it clear, however, that negligence on the part of the M. S. Buko Maru was the primary cause of the collision and that the improper construction of the railroad bridge was not shown to have been a contributing factor. *551 The court has arrived at this conclusion on the basis of the weight of all the evidence, taking into consideration the credibility and interest of the various witnesses and the consistency of their respective versions with the objective facts.
Turning first to the liability of the Great Lakes Towing Company, one of its tugboats was pulling the Buko Maru's bow and the other was guiding the stern. The Buko Maru supplied its own power from time to time, but it could not rely entirely on itself because its engine even at dead slow went too fast for safe navigation of the river. Under the circumstances of this trip, the tugs were intended primarily to assist the Buko Maru, and the master and the pilot of the Buko Maru remained basically in charge. Cf. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932).
After going around the last bend before the bridge, the tugs straightened out the Buko Maru in adequate time to make a straight shot through the 120' bridge draw. The Buko Maru was not supplying any power at this point. The forward tug whistled the bridge open and the span went up from right to left, roughly north to south. The front tug went through the draw pulling the Buko Maru properly in mid-stream.
The Buko Maru is 549' long, and when it was about one-third or 183' through the bridge draw, its starboard side was passing 5 to 8' from the north or right hand fender system of the open bridge. This is the proper way for a ship of this size to pass through the draw.
As this pass was being made by the front third of the ship, a lookout on the rear tug noticed that the stern of the Buko Maru began to slide to port. When the rear tugboat captain was notified of this, he radioed the Buko Maru to "go ahead on left rudder." A left rudder swings the stern to starboard on the Buko Maru. This would have had the effect of correcting the slide, but only if the rudder turned to port before the engine started. In the meantime the tug tried to pull the ship's stern toward the north or right hand shore as much as it could, until it had to desist due to shallow water.
The tugboat captain repeated his request by radio twice more. At about the time of the last call, a minute or so after the first, the rear tug noticed that the ship's propellor had started while the rudder was still turned to starboard. This pushed water against a starboard rudder, accentuating the slide to port. The rudder eventually did turn to port as requested, but too late.
The flying bridge of the Buko Maru, which was 150' from the stern, hit the upraised span of the railroad bridge at a point 2 to 4 feet inboard on the ship and on the southwesterly portion of the span. This ship which was 74' wide had swung across the 120' channel a distance of about 40'. During this period it moved forward at between 2 and 3 miles per hour, accelerating. If the ship was travelling at about 3 m. p. h. or 264' per minute, the entire swing occurred in less than one minute. The impact with the upraised span put the bridge out of operation but did not stop the momentum of the ship, and it continued its journey to Lake Calumet without further incident.
The contention that the front tug may have pulled the bow of the ship off course is not only contrary to the weight of the evidence but also contrary to the logic of the situation. The Buko Maru's crew and pilot hopelessly contradicted each other on this issue. Logically, there was no reason for the tug to try to alter the ship's course; the tugboat captain knew the river and knew that the next bridge did not require any turn. There was no wind or appreciable current and no obstruction in the river dead ahead, in short, no reason at all to pull the bow of the ship off course. The testimony of the tugboat crew must be accepted, that they pulled straight ahead after passing through the draw.
*552 The principal contention of the parties opposing exoneration of the towing company is that the forward tug could not talk directly to the Buko Maru because of a defective radio. The radio was able to communicate with the rear tug which in turn could talk to the ship. However, there was no evidence that the front tug had anything significant to say to the ship at this point. The front tug could not see back to the parts of the Buko Maru which were involved in the problem, so its unseaworthiness had no connection with the collision.
The rear tug which had direct radio communication with the ship gave it proper advice when the crisis arose. This is all that is required of the towing company. Distinguish American Bridge Division, etc. v. Roen Steamship Co., et al., 216 F.Supp. 353 (E.D.Wis., 1963) aff'd 328 F.2d 838 (7th Cir. 1963).
Turning now to the controversy between the bridge owner and shipowner, the evidence clearly shows that the navigation of the Buko Maru was faulty. The improper interaction between its rudder and the propellor as observed by the rear tug was caused by faulty commands on the ship's bridge combined with the nature of the ship's mechanism. The ship's pilot ordered the rudder to starboard when her starboard midship was passing the north fender system of the bridge. Why he did this is not clear, except that he apparently thought his bow was being pulled to port. He may have feared the stern would slide to starboard or that 5 to 8' clearance was too close. Whatever his purpose, he attempted to correct by ordering a hard port rudder, and the problem was then aggravated by the propellor starting up when the rudder was still turned to starboard. This happened in the following manner.
When the slide to port had been started by the starboard rudder, the rear tug requested a left rudder for a second and then a third time. At about that moment, the pilot on the Buko Maru gave the command "Hard to port, dead slow ahead" (or, he says, ". . . half ahead"). This, of course, was intended to comply with the request to "go ahead on left rudder". It takes the Buko Maru's rudder 24 to 28 seconds to move from hard starboard to hard port (a total of 70°). The pilot testified that after he gave the command, the engine for some reason did not respond for 25 to 30 seconds. The ship was on manual controls and to change the rudder 70° requires four revolutions of the steering wheel. The rear tug saw the propellor turn for several seconds before the rudder changed over from starboard. By the time the rudder had moved to port, the stern of the ship was almost over against the south fender system of the bridge. Neither the ship nor the rear tug could correct the slide of 17,500 tons of the loaded ship in time to avoid the collision with the upraised bridge span.
This occurrence is not surprising when viewed in perspective. This was the Buko Maru's first trip through the Calumet River. She was one of the largest ships ever to go through up to that date, and those in charge should have known that it could be rather tight. She was a clumsy ship with a rudder too small to do the job without help from the propellor, and she consequently lost steerage under 3 m. p. h. Although the engine therefore was needed for steerage, it could not run slower than 5-7 m. p. h., too fast for the Calumet River. A pilot who had previously taken this ship through the Welland Canal found her difficult to handle, and one pilot ran her aground due to the sluggish response of the steerage mechanism. The tugboat captain confirmed that the Buko Maru was a difficult tow. All in all it appears that although the ship may have been fine on the open sea and in wide harbors, it was not well constructed for traversing a twisting and comparatively narrow waterway, especially in pitch darkness without searchlights.
The captain and crew of the Buko Maru were all Japanese, but they had taken on a Canadian pilot at Port Huron. He was in charge of the navigation and acted as an agent of the ship *553 company (See The Oregon, 158 U.S. 186, 194-195, 15 S.Ct. 804, 39 L.Ed. 943 (1895)). He spoke no Japanese, and all commands and radio communications were in English. The young helmsman at the time of the collision had no river experience and may not have understood the English orders as readily as he should have. There is evidence that even the pilot was not sufficiently qualified to handle this particular ship under these circumstances, as the foregoing sequence of events would indicate. Later in 1970 and in 1971 the Buko Maru made five trips through the bridge draw with different pilots and without incident. This all adds up to the conclusion that the ship and its crew were not up to the task of passing through the bridge draw without problems on the night in question. Under The Oregon, (supra), it is the moving ship's burden to exonerate herself from fault. (158 U.S. at 193, 15 S.Ct. 804).
The Buko Maru relies on the defense that the impact would not have occurred if the bridge had been raised to its designed height of 82° instead of its actual opening of 75°. When the War Department authorized the bridge in 1909, it prescribed the opening of 82°. After construction in 1912, the War Department inspector certified that the bridge complied with the authorization. There is no evidence to show when the variation from 82° to 75° occurred, but there is also no evidence that this variation only occurred on the night in question. The bridge apparently opened on the night in question just as it had been opening for years, perhaps ever since the time of the original War Department approval. Therefore the angle of opening on July 13, 1970 was not an act of negligence but at most a negligent condition.
The next question is whether the 75° angle of opening constituted an "unreasonable obstruction" to navigation, as forbidden by 33 U.S.C. §§ 312 and 494. The evidence shows that the bridge had been so declared by the War Department in 1956 as a basis for authorizing a new replacement bridge to be built and paid for by the government. However, this statutory prerequisite for obtaining funding is not necessarily an accurate determination of a navigational problem in the case at bar. The government, in a non-adversary hearing, can make a general determination for its own purposes without foreclosing a different finding in a specific situation. Cf. Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co., 199 F.2d 761, 765 (5th Cir. 1952); Pacific Spruce Corp. v. City & County of San Francisco. 72 F.2d 712, 714 (9th Cir. 1934).
Although the span encroached over the channel more at 75° than at 82°, this does not seem to be an "unreasonable" obstruction to the navigation of the Buko Maru in this case. Thousands of ships had gone through this draw without incident since the bridge was constructed, an average of 1400 a season in recent years. The channel was 120' wide at this point and the overhang of the span even at 75° left almost all of the channel completely clear. The stern of the Buko Maru slid clear across the channel to its extreme south edge and still only hit the upraised span with its flying bridge at a point almost 60' above the water. The language and holding in Seaboard Airline R. Co. (supra), where a channel had been narrowed by a bridge, are quite applicable to the case at bar:
When, as the record shows to be the case here, the conditions claimed to be unlawful or negligent are entirely passive and have existed for many years to the knowledge of the moving vessel; when, too, the evidence is, as here, uncontradicted that, while these conditions do tend to make the passage more difficult than if they did not exist, a passage can be safely made under the conditions if due care is exercised; there is no basis in the record even for a division of the damages in favor of the actively negligent *554 moving vessel, much less for awarding it full damage. [citation omitted].
The ultimate question is whether the span, uplifted at 75° instead of 82°, contributed to cause the collision. It is difficult to imagine that the ship would have cleared the bridge under any circumstances, because the ship was sliding sideways as well as moving forward and no one can tell where the slide would have stopped. One witness on the rear tugboat testified that the slide seemed to accelerate as the ship crossed the channel, and all agreed the Buko Maru did not get onto a correcting port rudder until just before the collision with the bridge, prior to which the ship's propellor was turning on a starboard rudder. This distinguishes the case at bar from the similar case of Wilmington Transport Co. v. Standard Oil Company, 53 F.2d 787 (9th Cir. 1931).
The configuration of the damage indicates that the slide to port had not stopped at the time of impact, because the 2300 ton span was bent 6' inland or southerly as well as upstream or westerly. The span was caught on its further extremity by the ship at almost a 30° angle, which indicates that the ship had not nearly straightened out at impact. This was not a mere scraping: six heavy trunnion bolts at the base of the span were sheared by the heavy impact. Given all these facts, it would be speculative to hold that the ship would have cleared the span if raised another 7° (5 or 6 feet) further inland.
There can be little doubt, therefore that the Buko Maru was principally responsible for this collision. The evidence fails to establish that the railroad was more than a minor or passive contributor. This is not a case where the negligence of the bridge owner so clearly contributed that it should share the damages equally with a negligent shipowner, as in Atlee v. Northwestern Union Packet Co., 88 U.S. 389, 21 Wall 389, 22 L.Ed. 619 (1875). If the bridge owner had the burden of proving that its departure from the War Department permit could not have contributed to the collision, as some collision cases apparently hold (cf. Circle Line Sightseeing Yachts v. City of New York, 283 F.2d 811 (2nd Cir. 1960); The Pennsylvania v. Troop et al., 86 U.S. 125, 19 Wall 125, 22 L.Ed. 148 (1874)), this burden has not and cannot be sustained under the circumstances of this particular collision. If on the other hand, the shipowner had the burden of proving that the condition of the bridge did in fact contribute to the collision, this burden has not been sustained either. P. Dougherty Co. v. United States, 207 F.2d 626 (3rd Cir. 1953), cert. den. 347 U.S. 912, 74 S. Ct. 476, 98 L.Ed. 1068 (1954). This apparent inconsistency should be resolved realistically and equitably by limiting the rule of The Pennsylvania (supra) to moving ships which were actively or primarily negligent. Certainly the Pennsylvania and the Atlee courts were not deciding a controversy similar to the one at bar. Since the evidence fails to establish causation on the part of the bridge, it seems fair that the negligent shipowner should bear the damages. The Umbria, 166 U.S. 404, 405, 17 S.Ct. 610, 41 L.Ed. 1053 (1897).