CHICAGO AND WESTERN INDIANA RAILROAD COMPANY, a corporation, et al., Plaintiffs-Appellees,

v.

MOTORSHIP BUKO MARU, her engines, tackle, apparel and furniture, and the Sanko Steamship Co., Ltd., a Japanese corporation, Defendants-Appellants,

and

TUG JOSEPH H. CALLAN, TUG ARIZONA and the Great Lakes Towing Company, Defendants-Appellees.

No. 73-2123.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1974.

Decided Nov. 4, 1974.

Rehearing Denied Dec. 13, 1974.

Robert D. Barnes and Jonathan Dean, Chicago, Ill., for defendants-appellants.

C. Roy Peterson, John W. McMurray, Chicago, Ill., for plaintiffs-appellees.

Before HASTINGS, Senior Circuit Judge, and CUMMINGS and PELL, Circuit Judges.

HASTINGS, Senior Circuit Judge.

These actions arose out of a collision on July 13, 1970, between the Japanese Motorship Buko Maru (Ship), owned by Sanko Steamship Co., Ltd. (Sanko), a Japanese corporation, and a single leaf Strauss Bascule Drawbridge owned and operated by the Chicago and Western Indiana Railroad Company (Western Indiana) while the Ship was being assisted up the Calumet River from Lake Michigan to Lake Calumet by two tugs of the Great Lakes Towing Company (Towing Company). Western Indiana was in turn owned by five other railroads each of which owned 20 per cent of the stock of Western Indiana. The railroads brought a civil action within the admiralty and maritime jurisdiction of the district court against the Ship, Sanko, each of the tugs and the Towing Company for damages consisting of the cost of temporary and permanent repairs to the bridge, of constructing a connecting track to other railroad facilities, and of routing rail traffic over the connecting lines. Motions to intervene by three other railroads having rights as tenants to use the bridge under agreements with Western Indiana were continued pending trial of the liability issues.

The Towing Company brought an action under the maritime and admiralty jurisdiction seeking exoneration from liability or, in the alternative, for limitation of liability pursuant to various statutes. The district court ordered the actions of the railroads and the Towing Company consolidated for trial of the liability issues arising out of the collision.

The liability issues were tried to the court, Honorable Thomas R. McMillen, Judge, presiding, between January 3 and 23, 1972, and on March 2, 1972, the court issued a decision exonerating the Towing Company and finding the Ship at fault and responsible in damages to the plaintiff railroads. In re Great Lakes Towing Co., 348 F.Supp. 549 (N. D.Ill.1972).

On June 25, 1973, the petitions to intervene of the tenant railroads were granted and the district court issued a judgment order adopting the March 2, 1972, decision as the court's findings of fact and conclusions of law. It held the Ship and Sanko liable to Western Indi-

ana and the proprietor and tenant railroads for damages in the aggregate amount of $873,826.98, exclusive of interest and costs. The Ship and Sanko appeal from that judgment. We affirm.

Appellants raise the following issues: (1) whether the court's findings with respect to the navigation and seaworthiness of the Ship were clearly erroneous; (2) whether the district court erred in exonerating the tugs and Towing Company from liability; (3) whether the district court's finding of a 75 degree angle of opening of the bridge at the time of the collision was clearly erroneous; and (4) whether the district court erred in failing to apply the Pennsylvania rule to find that Western Indiana was a cause of the collision.

### I.

■■ A heading in appellants' brief claims that the findings and conclusions of the district court concerning the seaworthiness and navigation of the Buko Maru were clearly erroneous, yet the text of the brief makes no supporting argument or reference to the record. Rule 28(a)(4) of the Federal Rules of Appellate Procedure, 28 U.S.C., requires that appellant's brief include an argument which "shall contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Where an appellant fails to comply with this rule, we are not required to search the record for error. Holt v. Sarver, 8 Cir., 442 F.2d 304, 307 (1971). Nevertheless, we find that these findings and conclusions of the district court were amply supported by the evidence.

The district court concluded that the Buko Maru, although suitable for the open sea and wide harbors, "was not well constructed for traversing a twisting and comparatively narrow waterway," and that the navigation of the ship was faulty. In re Great Lakes Towing Co., *supra*, 348 F.Supp. at 552.

The district court reached its conclusion regarding seaworthiness after reviewing the construction and operating mechanisms of the Ship. She was approximately 549 feet long and 74 feet wide and weighed about 17,500 tons as she was loaded at the time of the collision, with a cargo of steel products. The trial court found that "[s]he was a clumsy ship with a rudder too small to do the job without help from the propellor, and she consequently lost steerage under 3 m. p. h. Although the engine therefore was needed for steerage, it could not run slower than 5–7 m. p. h., too fast for the Calumet River." In re Great Lakes Towing Co., *supra*, 348 F. Supp. at 552.

The findings were well supported by the deposition of Great Lakes Captain Melvin Leslie Nobes who had piloted the vessel through the Welland Canal. Captain Nobes detailed the mechanical problems of the Ship and told how, just a week prior to the collision in this case, he had run the vessel aground when he was unable to get a response from the rudder. Glenn V. Dawson, captain of the tug Arizona, testified that he had had difficulty in handling the Buko Maru throughout the trip on the Calumet River prior to the collision because of the performance of the Ship's rudder and engine. The trial court's findings and conclusions concerning the seaworthiness of the Buko Maru were supported by substantial evidence and were not clearly erroneous.

A simple recitation of the uncontested facts about the conduct of the crew of the Ship in its approach to the bridge demonstrates the validity of the trial court's conclusion of the Ship's faulty navigation.

The captain and crew of the Ship were all Japanese. At Port Huron, Michigan, the Ship took on a Canadian Great Lakes pilot, Harry S. Randall, who was responsible for giving engine and rudder orders to the crew of the Ship. Randall spoke no Japanese, so all commands were made in English. The seaman at the helm, Shimada, was 22 years old, was making his first trip to the Great Lakes, had only sailed as

quartermaster for a period of three months, and spoke no English. Third Officer Sakou, who was stationed at the engine telegraph controls and who was responsible for receiving and carrying out all engine orders, was 25 years old, was making his first trip to the Great Lakes, and said, through a Japanese interpreter, that his ability to understand English was "so and so."

At the mouth of the Calumet River the Buko Maru was met by the tugs of the Towing Company. The tug Joseph H. Callan was attached by tow line to the bow of the Ship and the tug Arizona to the stern. As the vessels approached the bridge at about midnight the bow tug sounded the required signal for opening the bridge and the bridgetender responded by opening it. Although dark, visibility at the time was clear and there was no noticeable wind or current affecting navigation. At no time prior to the collision was there any attempt by Randall to communicate with the bow tug about the procedure to be followed in going through the bridge draw.

After the Ship was about one-third through the bridge draw Randall ordered the rudder to be put hard to starboard. The right rudder caused the stern of the Ship to move to port, toward the bridge leaf to the left of the Ship. Captain Dawson on the stern tug made three calls to the Ship requesting that the Ship go ahead on a port rudder in order to counteract the swing to port. The Ship did not respond until the third request, but the attempt to correct the swing failed because the propeller was started up before the rudder had been changed from the hard starboard position and the effect was only to accelerate the swing to port. At 12:20 a. m. the port wing of the navigation bridge deck of the ship collided with the bottom chord of the westerly truss of the railroad bridge. The stern port lookout was in the washroom.

These facts make it evident that the district court was not clearly erroneous in finding and concluding that the Ship was guilty of faulty navigation.

## II.

Appellants also claim that the trial court erred in exonerating the Towing Company from liability. Appellants contend that if the Ship and Sanko are found liable, then the Joseph H. Callan, the Arizona, and the Towing Company should be required to pay their proportional share of the damages because they were contributing causes to the collision.

Appellants argue that the Towing Company and the tug Arizona are liable for damages under the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), for violation of 46 U.S.C. § 673. The *Pennsylvania* rule imposes upon a vessel, which at the time of a collision, is in violation of a statutory rule intended to prevent collisions, the burden of proving that the violation could not have been a cause of the collision. Title 46, U.S.C. § 673, limiting the hours of work of officers and seamen, is applicable only to "merchant vessels of the United States of more than one hundred tons gross." The only member of the crew of either tug who had been at work for more than eight hours at the time of the collision was Glenn V. Dawson, Captain of the stern tug, Arizona. The record in this case includes the sworn affidavits of two marine surveyors that the Arizona at the time of the collision had a gross tonnage of 98 tons. The affidavits were not contested. Therefore, 46 U.S.C. § 673 was not applicable to the officers and crew of the Arizona and thus there was no statutory fault on the part of the Arizona to trigger application of the *Pennsylvania* rule.

Appellants also contend that the bow tug Joseph H. Callan and the Towing Company should share in the liability for damages because the bow tug's radio was inoperative to the extent that it made it impossible for that tug to communicate directly with the Ship. The facts, however, demonstrate that the defective radio could not have been a cause of the collision. The bow tug's radio did permit it to communicate to the

stern tug which could, in turn, talk to the Ship. The Ship's pilot and Ship's captain both thought that they could talk to the bow tug on the radio. There was, however, as the court found, no need to communicate with the bow tug. The navigational concerns only arose after the bow tug and the bow of the Ship had passed through the bridge draw. The bow tug could not have seen the problems at the stern and could not have done anything to remedy them. Since the defective radio of the tug Joseph H. Callan could not have been a cause of the collision, the district court properly exonerated it from liability.

### III.

Appellants claim that the trial court's finding of a 75 degree angle of opening of the bridge at the time of the collision was clearly erroneous. The angle of opening is important to appellants' contention that the bridge's failure to open to 82 degrees, as required by its War Department permit, was a statutory violation which required application of the *Pennsylvania* rule and the imposition of a burden of proof which, it argues, Western Indiana did not satisfy. That contention is discussed in Part IV, *infra*. We deal here only with the finding of fact.

In order to determine whether the finding of a 75 degree angle was clearly erroneous it is necessary to review the evidence presented at trial on the question of the angle of opening of the drawbridge at the time of the collision. George E. Leithner, a marine surveyor with 24 years experience, testified on behalf of the railroads. He determined the angle of opening at the time of the collision to be 75 degrees by use of a triangulation method which involved plotting on scale drawings the point of impact on the Ship above the water and the point of impact on the bridge. Leithner also was present at a later time when the opening was measured with an inclinometer and found to be 77 degrees. Sanko Exhibit 43–1, a drawing of the bridge by an engineering firm based on a survey following the accident, shows the angle of opening as 75 degrees. James E. Peterson, Chief Engineer of Western Indiana, testified that in normal operation the bridge had an angle of opening between 76 and 79 degrees.

The only evidence indicating an angle of opening of less than 75 degrees was the testimony of marine surveyor Harlow Meno, who had been an independent surveyor for 24 years, and was called as an expert witness by the Towing Company. Meno measured the bridge opening more than a week after the collision and determined that the angle of opening ranged from 71.5 degrees on the east side of the bridge to 73.5 degrees on the west. Meno again measured the bridge in August, after repairs on the bridge had begun, and found the angle of opening to be "a hair under 77 degrees." Meno's method of measurement on both occasions was to place a pair of hinged sticks, one on a horizontal rail and one against the rail as the bridge was up, and then move the hinged sticks, lay them down and measure the opening with a bevel square.

Ray Oswalt, a civil engineer employed for 15 years with the American Bridge Division of United States Steel, which did the repair work on the bridge, testified concerning the comparative accuracy of the methods of measurement used by Leithner and Meno. Oswalt testified that Meno's method was not a good one to determine the angle at the time of the collision because it required measurements of the bottom floor system of the bridge which had been severely distorted by the accident. The cross-examination of Meno also suggests that his method may have produced an inaccurate result if the hinged sticks failed to remain in place as they were transported from the bridge to the bevel square on the ground. Oswalt testified that the proper means of measuring the angle was triangulation, the method used by Leithner, in arriving at the 75 degree figure.

The calculations of Leithner appear to be the most accurate means of determin-

ing the angle of opening at the time of the collision because they were based on a determination of the location of the damage to the Ship and bridge and not on simple measurements of the damaged bridge or the bridge after repair. With the exception of Meno's measurements made by a method of questionable accuracy, all other evidence demonstrated an opening of at least 75 degrees. The trial court's 75 degree finding seems well justified and certainly not clearly erroneous.

### IV.

■ Appellants claim that the district court erred in failing to apply the *Pennsylvania* rule to find Western Indiana a cause of the collision and proportionally liable for damages. The rule was established by the Supreme Court in The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), and provides that when

> a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. 86 U.S. (19 Wall.) at 136.

The Court there also said: "It must be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration." *Id.*

Appellants here claim that the statutory fault of Western Indiana was the failure of the bridge to open to 82 degrees, the angle of opening specified in its War Department permit. On September 14, 1909, the Acting Secretary of War issued an Approval Permit authorizing Western Indiana to construct the railroad bridge over the Calumet River. The permit stated that the bridge had

been authorized by an Act of Congress (Act of Aug. 5, 1909, ch. 9, 36 Stat. 178) which required that the bridge be built in accordance with the Act of March 23, 1906, ch. 1130, 34 Stat. 84, now 33 U.S.C. § 491 et seq., which required that construction plans for bridges over navigable waters be approved by the Secretary of War and Chief of Engineers. The permit approved the construction on the condition that the bridge plans be complied with and that the bridge allow a full channel width of 120 feet. A legend on the plans attached to the permit reads: "Note: Fine dot lines indicate bridge in fully open position. Angle of opening: 82°–0′."

Since, as discussed in Part III, *supra,* the trial court's finding that a bridge angle of opening of 75 degrees was not clearly erroneous, it must be accepted by this court as correct. With a 75 degree angle of opening the Western Indiana bridge was in violation of its War Department permit.

Despite this violation, the trial court nevertheless declined to apply the *Pennsylvania* rule to the bridge on the ground that the rule should be limited to moving ships which were actively or primarily negligent. In re Great Lakes Towing Co., *supra,* 348 F.Supp. at 554. Subsequent to the district court decision in this case, however, we explicitly held that the *Pennsylvania* rule was to be applied to bridges, Complaint of Wasson, 7 Cir., 495 F.2d 571, cert. denied, —— U.S. ——, 95 S.Ct. 78, 42 L.Ed.2d 73 (1974), and said: "We follow the line of cases which hold that a violation of the provisions of a War Department permit imposes on the bridge owner the burden of showing that the violation could not have contributed to the casualty." *Id.* at 580.

The failure of the bridge to comply with the requirement of an 82 degree angle of opening is a statutory fault sufficient to trigger the application of the *Pennsylvania* rule. Under the rule we must determine whether Western Indiana has sustained its burden of proof.

It should be noted that the district court, although holding the *Pennsylvania* rule inapplicable, nevertheless stated that if it were required to apply the rule it would hold that under the circumstances of this case Western Indiana had not and could not sustain its burden. In re Great Lakes Towing Co., *supra*, 348 F.Supp. at 554.[1] After a careful consideration of the record, we disagree.

The burden of proof imposed by the *Pennsylvania* rule, although difficult to sustain, is not impossible. Indeed, in the case upon which our court in *Complaint of Wasson, supra,* relied in holding that a failure to comply with a War Department permit invokes the *Pennsylvania* rule, The Fort Fetterman v. South Carolina State Highway Dept., 4 Cir., 261 F.2d 563 (1958), aff'd in relevant part on rehearing, 268 F.2d 27 (1959), the ultimate result of the litigation was that the court of appeals affirmed the finding of the district court, on remand, that the failure of the bridge to open to the angle required by its War Department permit could not have been a cause of the collision. The Fort Fetterman v. South Carolina State Highway Dept., 4 Cir., 278 F.2d 921 (1960).

We are satisfied here that the railroad sustained its burden of proof by showing that its failure to open the bridge to 82 degrees could not have been a cause of the collision. We reach this conclusion for the following reasons.

The purpose of the 82 degree angle requirement was to assure that the entire navigational channel of 120 feet in width was clear up to a height of 120 feet above the water. The bridge open to 82 degrees would only begin to extend over the channel at a height of 120 feet. The permit was not designed to prevent a collision outside the channel. Alfred J. Banas, a 22 year veteran of interpreting permits for the Army Corps of Engineers, testified that the area beyond the 120 foot channel is not protected by the permit.

The physical circumstances of the collision compel us to conclude that at the time the Ship struck the bridge, it had gone outside the protected channel. We have held that the trial court's finding of a 75 degree angle of opening is not clearly erroneous. The district court found that at the time of impact the angle of the Ship to the bridge was 30 degrees. The testimony of three expert witnesses at trial, including Sanko's own expert, support this finding and appellants do not challenge it on appeal. Sanko Exhibit 94 demonstrates that if the bridge was open to 75 degrees and the Ship's angle of approach to the bridge was 30 degrees and the Ship was at the extreme south edge of the 120 foot channel, the Ship would have cleared the bridge by 5.81 to 6.87 feet. Appellants and their expert witness, Horn, accept this premise. For the Ship to have hit the bridge upraised to 75 degrees at a 30 degree angle, as it did, the Ship must have gone outside the 120 foot protected channel.[2] This reasoning is bolstered by

1. The trial court seems to have based its conclusion that the *Pennsylvania* rule's burden of proof had not been sustained on its belief that "it would be speculative to l old that the ship would have cleared the span if raised another 7° (5 or 6 feet) further inland." In re Great Lakes Towing Co., *supra*, 348 F.Supp. at 554. The basis for the court's belief seems to be revealed in a colloquy between the judge and the attorney for the railroad concerning the implication of Newton's Law on the Ship's slide to port and whether the Ship might have stopped before hitting a bridge at 82 degrees, five or six feet further away than this bridge was:

The Court: . . . Obviously it stopped swinging someplace along in there. But we don't know whether the bridge stopped it from swinging or whether its natural momentum stopped it from swinging.

Mr. McMurray: Well, your Honor, the only thing—the natural forces involved would stop the vessel when it impacted and came up against a resistance, w..ich was the bridge.

The Court: Not necessarily.

The district court's finding that the burden had not been sustained, thus, might well have resulted from a misapplication of the laws of physics.

2. The district court's decision does not clearly state whether the Ship was within the

the fact that when the bridge is open to 75 degrees it first extends over the 120 foot channel at a height above the water of about 85 feet. The place of impact on the Ship was only about 57 feet off the water. The bridge was not encroaching into the channel at any height where it could have been struck by this Ship if the Ship was within the channel. Thus, any failure of Western Indiana to keep any part of the channel clear could not have been a cause of an accident occurring outside the channel. Western Indiana has borne its burden of proof under the *Pennsylvania* rule.

In light of the foregoing, the judgment appealed from is affirmed.

Affirmed.

channel at the time of the collision. The court says only that "[t]he stern of the Buko Maru slid across the channel to its extreme south edge . . . ." Insofar as this finding might suggest that the Ship was wholly within the channel, it is clearly erroneous.