**GENERAL FOODS CORPORATION**

v.

**George C. BAKER et al.**

**Civ. No. Y–77–2106.**

United States District Court,
D. Maryland.

June 6, 1978.

Paul D. Bekman, Baltimore, Md., for plaintiff.

James W. Constable, Baltimore, Md., for defendants.

JOSEPH H. YOUNG, District Judge.

Plaintiff, General Foods Corporation, brings a claim for damages against defendants, Penn Central Transportation Company and the United States, arising out of the allision of the SS YORKMAR with the Penn Central Railroad Bridge over the Chesapeake and Delaware Canal on February 2, 1973. The defendants were held jointly and severally liable for this occurrence, *Hogge v. SS YORKMAR*, 434 F.Supp. 715 (D.Md.1977). The bridge was closed to railroad traffic for approximately four months, during which time plaintiff was forced to ship goods to and from its manufacturing plant in Dover, Delaware by truck. Plaintiff now seeks to recover the additional shipping costs which it thereby incurred.

In an earlier Memorandum and Order, filed March 21, 1978, the claim was dismissed as to the defendant United States since, without special circumstances not present in this case, no cause of action will lie for negligent interference with business rights as opposed to intentional interference.

Defendant Penn Central now seeks similar relief. Its motion will be granted since plaintiff's expenses for alternate transportation, even if proven, are not recoverable damages, for all of the reasons stated in the prior Memorandum.

Plaintiff argues that it has a special relationship with the defendant railroad, which knew that plaintiff depended upon the bridge as the sole means of rail access to and from its plant. Plaintiff further contends that this advance awareness differentiates it from *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), where the defendant did not know of plaintiff's existence.

In *Robins*, time charterers of a vessel were not allowed to recover losses sustained when defendant negligently performed repairs, thereby keeping the vessel out of use. Plaintiff was not allowed to avoid the general rule against third party recovery of purely economic losses on the basis of its contractual relationship with the owner of the vessel.

Plaintiff cites *Chicago and Western Indiana Railroad Company v. BUKO MARU*, 1974 AMC 2277 (7th Cir. 1974), where tenant railroads, as well as proprietor railroads, were allowed to recover economic losses due to defendant's negligent allision with the bridge. However, the present plaintiff's connection with the allision is far more remote than plaintiffs in the *BUKO MARU* allision.

*Robins* has been criticized on the basis that:

> If the defendant were liable to the charterer instead (of the owner), it would not be a wide and open-ended liability, but a finite one that the tortfeasor or his liability insurer would expect to pay under frequently occurring circumstances. There seems to be no valid reason why defendant should escape this ordinary item of damages just because the loss in this case happened to be suffered by one who had no proprietary interest in the ship.

F. James, *Limitations on Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal*, 25 Vanderbilt Law Review at 55–56 (1972). Since the holding in the *BUKO MARU* case only allows tenant railroads to recover damages which would have been recoverable if the proprietor railroad was furnishing all services, there is a built-in limit on the extension of liability. However in the instant case, allowing plaintiff to recover would invoke an open-ended liability for shippers who suffer costs for rerouting. Plaintiff's past business relationship is not the kind of special relationship upon which to base liability for solely economic loss based on negligence.

The fact that plaintiff is a foreseeable plaintiff may differentiate this case from *Robins*; however, at bottom, the policy against recovery is not an issue of foreseeability, but a need for a limiting principle on the consequences of negligent conduct. Problems of speculative damages, and the need to conserve a defendant's resources for those most directly affected by the occurrence have long militated against damages in situations such as the present one. *See* prior Memorandum and Order and cases cited therein.

In *Petition of Kinsman Transit Co.*, 388 F.2d 821 (2nd Cir. 1968), the court agreed that plaintiff was foreseeable, but stated:

> The instant claims occurred only because the downed bridge made it impossible to move traffic along the river. Under all the circumstances of this case, we hold that the connection between the defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery. "The law does not spread its protection so far."

*Id.* at 825.

Plaintiff next contends that Penn Central breached its obligation as a common carrier to receive, carry and deliver all goods offered for shipment. This duty has been incorporated in the Interstate Commerce Act, 49 U.S.C. §§ 1(4), 1(11). The essence of plaintiff's argument is that a carrier may not relieve itself of liability by declaring an embargo when its own negligence was a partial cause for the cessation of service. For the reasons to be stated below, the contention is unsound.

Discontinuation of rail service can cause great harm, and railroads are held to a higher standard of responsibility than most private enterprises. They may not, on their own authority, refuse to maintain service when it becomes inconvenient to do so or because profits are declining. *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); *Ethan Allen, Inc. v. Maine Central Railroad Co.*, 431 F.Supp. 740 (D.Vt. 1977). A railroad may not make a unilateral decision to abandon a line, but must apply to the Interstate Commerce Commis-

sion for a certificate, pursuant to 49 U.S.C. § 1(18).

▇▇▇ Abandonment, which is a permanent or indefinite cessation of service, must be distinguished from an embargo, which is temporary and may be issued by the carrier alone. *Interstate Commerce Commission v. Baltimore and Annapolis Railroad Company*, 398 F.Supp. 454, 461–62 (D.Md.1975). Embargoes are governed by 49 C.F.R. § 1006.1, which states in part:

(a) Whenever any common carrier of property or freight forwarder subject to the Interstate Commerce Act finds that because of a lack of facilities or personnel, or because it is required to give preference and precedence to other traffic legally entitled to such priority, or because of other compelling circumstances not within the control of the carrier or freight forwarder, it is or soon will be unable to perform all authorized and required transportation services requested of it, and that it will be necessary for it temporarily to suspend the offering of service in the transportation of any commodity, commodities, or class of traffic, . . . it shall immediately give public notice of such fact by a written notice of an embargo, specifying the extent thereof, the date the embargo is to become effective, its duration, if known, and the reasons why the placing of the embargo is necessary.

An embargo notice need not be published like a tariff; the carrier simply must notify the shipper that it is physically unable to accept shipments.

▇▇▇ When an embargo is lawfully invoked, no damages are recoverable. The railroad determines the need for it in the first instance, and the validity and reasonableness of that decision is generally subject to review by the ICC, or when plaintiff files suit in federal court, pursuant to 49 U.S.C. § 9.

Physical conditions, such as tunnel deterioration or lack of equipment, or problems created by adverse weather and flooding have all justified embargoes. *E. g., Interstate Commerce Commission v. Chicago,* *Rock Island and Pacific Railroad Co.,* 501 F.2d 908 (8th Cir. 1974); *Asbury v. Chesapeake and Ohio Railway Company,* 314 F.Supp. 310 (D.D.C.1970).

Plaintiff argues that the suspension of service in this case does not excuse the carrier from liability because its negligence was part of the occurrence which led up to the embargo. Plaintiff's theory is that defendant cannot therefore claim that the embargo was justified by circumstances beyond its control. Under this theory, only acts which defendant never had the ability to prevent could lead to a situation justifying embargo, and excusing performance.

However, the regulation provides broader relief from liability. The plain words of the statute limit the carrier's liability while service is impossible. When the statute refers to circumstances beyond control, it refers to the situation as it has evolved, not to the events which led up to it. Such an interpretation is more consistent with the public safety which is better served if the railroads freely exercise judgment in favor of embargo under unsafe conditions, without fearing liability.

Plaintiff's reliance on *Johnson v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 400 F.2d 968 (9th Cir. 1968), is misplaced. In that case, service was discontinued for a five-month period after a tunnel cave-in. There was evidence, which if believed, showed that the railroad had been aware of deterioration in the tunnel for ten years prior to the cave-in. This is the context in which the court spoke about the inability of the railroad to avoid liability in view of its own negligence. The holding prevents a railroad, which is not allowed to discontinue service for reasons such as unprofitability, from allowing deterioration, and then ceasing performance without liability. This situation arises more often in the abandonment cases, where a main factor considered by the ICC in deciding whether to grant the certificate is the extent to which the railroad itself has been responsible for the conditions. *See ICC v. Baltimore and Annapolis Railroad, supra,* at 464 and cases cited therein.

When external events over which a carrier has no control occur, the carrier retains the responsibility for using all reasonable means to protect cargo then in his possession. Failure to do so results in liability for negligence. *E. g., Farr Co. v. Union Pacific Railroad Co.,* 106 F.2d 437, 439 (10th Cir. 1939); *Chesapeake & Ohio Railway Co. v. J. Wix & Sons, Ltd.,* 87 F.2d 257, 259 (4th Cir. 1937). The sound policy reasons for such a rule are self-evident.

In the instant case, no such policy considerations favor the imposition of liability. There was antecedent negligence, but it was not a long and conscious policy of non-repair such as occurred in *Johnson, supra.* Plaintiff does not allege that the railroad was dilatory in reopening the bridge, or that the bridge was able to bear traffic sooner. This was an embargo, not an abandonment.

Thus, under the facts of this case, the embargo was justified, and the carrier was relieved of liability for inability to carry goods during that period.

Accordingly, it is this 6th day of June, 1978, by the United States District Court for the District of Maryland, ORDERED:

That the motion to dismiss the complaint be, and the same is, hereby GRANTED.