**NATIONAL GRAIN AND FEED ASSOCIATION, Petitioner,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Respondents,**

Burlington Northern Railroad Company, North Dakota Public Service Commission, North Dakota Wheat Commission, North Dakota Barley Council, Intervenors.

**NORTH DAKOTA GRAIN DEALERS ASSOCIATION, Petitioner,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Respondents,**

Burlington Northern Railroad Company, North Dakota Public Service Commission, North Dakota Barley Council, North Dakota Wheat Commission, Intervenors.

Nos. 92–2398, 92–2455.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1993.

Decided Sept. 16, 1993.

Andrew Goldstein, Washington, DC, argued (John Cutler, Jr., on the brief) for petitioner National Grain and Feed Ass'n.

William W. Binck, Asst. Atty. Gen., Bismarck, ND, argued, for intervenor North Dakota Wheat Com'n.

Samuel M. Sipe, Jr., Washington, DC, argued, for intervenor Burlington Northern R.R.

Louis Mackall, V, I.C.C., Washington, DC, argued, for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

HEANEY, Senior Circuit Judge.

The National Grain and Feed Association and the North Dakota Grain Dealers Associ- ation petition for review of a decision by the Interstate Commerce Commission ("the Commission") approving the Certificate of Transportation program of the Burlington Northern Railroad Company. We affirm in part and reverse in part, and remand to the Commission for further consideration of the relevant common carrier obligations.

## I

In June 1988 Burlington Northern Railroad Company began selling guaranteed future rail transportation capacity by public auction. The Burlington Northern auction allows shippers to bid on specified rail transportation up to five months in advance of an approximately two-week shipping period. Shippers participating in the auctions bid on negotiable Certificates of Transportation ("COTs") that are specific to one of fourteen different "corridors." A corridor, in turn, is specific to the particular commodity to be shipped as well as to the size and direction of shipment.[1]

Burlington Northern manages all aspects of the COT auctions, periodically announcing the offer of specified COTs and setting the minimum acceptable bid. Shippers transmit bids by telephone or telefacsimile. Under current practice, the successful bidder must make an initial down payment of twenty-five percent of the COT purchase price, the balance to be paid five days before the designated shipment period. The successful COT bid, together with the relevant corridor information, is filed with the Commission on one day's notice as a tariff pursuant to 49 U.S.C. § 10762 (1988).

Because COTs are filed as tariffs, rather than contracts, there is no specific statutory limit on the grain car capacity that Burlington Northern could auction through such a program, and there is no limit on the quantity of COTs that a single large shipper might purchase. As currently administered, Burlington Northern voluntarily limits the grain cars available for auction in the COT pro-

---

1. The relevant corridors are corn shipped west in unit trains ("Corn West Unit"), corn shipped east in unit trains ("Corn East Unit"), corn shipped west in single cars ("Corn West Single"), Corn East Single, Northern Wheat West Unit, North- ern Wheat East Unit, Northern Wheat West Single, Northern Wheat East Single, Southern Wheat Unit, Southern Wheat Single, Barley West Unit, Barley East Unit, Barley West Single, and Barley East Single.

gram to forty percent of its total covered hopper fleet. The percentage of the fleet actually auctioned in the COT program has been less than forty percent, but as conceded at oral argument, during periods of peak demand in certain corridors, the number of COT cars actually loaded may exceed seventy percent of all loadings.[2] It also is typical that as few as four large shippers control the vast majority of the COT car capacity.

Burlington Northern pays a penalty if it fails timely to supply the contracted rail cars for COT bearing shippers. Shippers who rely on the conventional tariff service, therefore, do not receive priority service, occasionally not receiving cars until after they no longer are needed. This second-rate service for conventional shippers exacerbates what allegedly already was untimely service for some shippers because of Burlington Northern's practice of providing conventional tariff service on a first-come-first-served basis, rather than allocating cars according to historical demand. The petitioners allege the COT program thus unreasonably increases the time conventional shippers must wait to receive car service—especially during periods of car shortages.

## II

On 7 March 1988 the petitioners filed a complaint with the Commission challenging the COT program as unlawful under the Interstate Commerce Act. They alleged four grounds on which the program violated the Act: The program does not qualify as a special tariff under 49 U.S.C. § 10734 (1988); the program violates Burlington Northern's common carrier obligations as described in 49 U.S.C. §§ 11101(a) and 11121(a)(1) (1988); the program's practices and procedures constitute one or more unreasonable practices under 49 U.S.C. § 10701 (1988); and COTs are contracts, not tariffs, and must therefore be approved and filed with the Commission as contracts pursuant to 49 U.S.C. § 10713 (1988).

The Commission heard the complaint pursuant to its modified procedures under 49 C.F.R. § 1112. On 20 April 1992 the Commission issued its decision in this proceeding, finding the petitioners' challenges to be without merit, and dismissing the complaint. *See National Grain and Feed Assoc. v. Burlington Northern R.R.*, 8 I.C.C.2d 421 (1992). In its decision the Commission concludes that Burlington Northern's COT program qualifies as a special tariff under 49 U.S.C. § 10734, that it is in substantial compliance with the Commission's tariff filing rules, that it does not violate Burlington Northern's common carrier obligations, and that it does not violate any other provision of the Interstate Commerce Act, including the prohibition of unreasonable practices.

The petitioners seek review of the decision of the Commission, to which they are entitled under 5 U.S.C. § 702. We exercise jurisdiction under 28 U.S.C. §§ 2321(a) and 2342(5). The petitioners seek reversal of the decision on the grounds the Commission misconstrued the relevant provisions of the Interstate Commerce Act, abused its discretion, and exceeded its statutory authority.

## III

Burlington Northern's COT program, a new approach to the sale of rail transportation, has never before been scrutinized by the Commission or the courts. Because some of the implicated provisions of the Interstate Commerce Act also have evaded judicial scrutiny, we are presented with several issues of first impression. In this context, we emphasize that when reviewing a ruling of an administrative agency, we are constrained to grant considerable weight to the agency's construction of the statutory scheme it is entrusted to administer. *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). "If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. Thus, we may not

---

**2.** *See also* Chart 1, *Total COT Carloads as % of Total Grain Carloads*, Add. C, Joint Brief of Petitioners.

substitute our construction of the statutes for a reasonable interpretation made by the Commission. *Id.* at 844, 104 S.Ct. at 2782–83.

### A. Contract versus Tariff

■ The petitioners allege the Commission abused its discretion and misconstrued the law when ruling that COTs may be filed as special tariffs under section 10734 rather than as contracts under section 10713. We find that the Commission's decision is based on a permissible construction of the statutory scheme of the Interstate Commerce Act, and that the Commission did not abuse its discretion in so ruling. The Commission's further finding that shippers may complain about the reasonableness of COT rates for specific movements provides some assurance that abuses of the classification may be remedied.

■ Commissioner Simmons dissented, noting that "[a]t a minimum," he "would have found that COTs do not qualify as tariffs and must be filed as rail contracts. This would have provided some protections to grain shippers affected by the COT system." 8 I.C.C.2d at 440. Commissioner Simmons's concern about the lack of shipper protections under a tariff-based COT program is not lost on us. The protections he alluded to under the contract system, however, are not forfeited under a tariff system; they are preserved in the common carrier obligations of Burlington Northern, and if not heeded, may be enforced by the Commission in a proper proceeding under the Interstate Commerce Act. The statutory protections of the contract system are, in fact, no more than enumerated protections designed to preserve the common carrier obligations.

Congress conducted a thorough review of the nation's rail transportation system before enacting the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (codified in scattered sections of 45 and 49 U.S.C.). The Staggers Rail Act introduced several modifications to the statutory regulation of the rail system, including authority for rail carriers to enter into contracts for rail transportation. Congress addressed concerns about the possible adverse consequences to shippers, and a lack of adequate protections, with several specific restrictions based on existing common carrier obligations: a limit on the rail equipment a carrier could devote to contract service; a limit on the use of contract service by particular large shippers; and explicit authority for the Commission to disapprove of a particular contract, or to limit future contracts of any carrier, upon a finding that the contract service would impair the ability of the carrier to fulfill its common carrier obligations. *See* 49 U.S.C. § 10713(d)(2)(A), (f) (1988). The congressional conferees expressly noted that these restrictions "are intended to ensure that a carrier can meet its common carrier obligations." H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 100 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4132 [hereinafter Conference Report].

■ Thus, with the inclusion of these specifically enumerated restrictions and prophylactic measures, Congress provided that a carrier's preferential treatment of shippers pursuant to an approved contract would be insulated against attacks alleging violations of the common carrier obligations. *See* 49 U.S.C. § 11101(a) (1988). The Staggers Act also provided statutory authority for rail carriers to offer special service options through premium tariffs to encourage more efficient utilization of rail cars. *See* 49 U.S.C. § 10734 (1988). The premium tariff provision does not, however, enumerate the same protections as the contract program. It is, nonetheless, restricted by the carrier's ability also to meet its common carrier obligations under its conventional service.

### B. The Common Carrier Obligation

Congress passed the Staggers Rail Act upon a finding that most transportation in the United States today is competitive, that the nation's railroads have deteriorated under the burden of unnecessary and inefficient government regulation, and that rail tariffs should be more responsive to market forces. Although Congress specifically set as one goal of the Act "to assist the rail system to remain viable in the private sector of the economy," Staggers Rail Act, 94 Stat. 1895, 1897, it also preserved the statutory common carrier obligations of rail companies to all shippers. Whether the innovative COT pro-

gram unduly thwarts Burlington Northern from meeting its common carrier obligations is the heart of this case, and highlights the potential difficulty of combining innovation and reliance on market forces with preservation and enforcement of the common carrier obligations.

More precisely, this case presents the question whether Burlington Northern's COT program violates its common carrier obligations during periods of grain car shortages; for when there is a surplus of available grain cars, there are few undue delays in car service. Shortages, however, appear to arise precipitously and with sufficient frequency as to cause problems for shippers [3]; indeed, the COT program would have little appeal to shippers if they did not anticipate delays in shipping their grain under the conventional tariff program. Assuming shortages arise sufficiently often to cause adverse consequences to shippers, what is the common carrier obligation that Burlington Northern must meet with regard to its non-COT clients?

The statutory common carrier obligations are set forth in two provisions of the Interstate Commerce Act. The first states that common carriers "shall provide … transportation or service on reasonable request" and that such service shall be "safe and adequate." 49 U.S.C. § 11101(a) (1988). The second provision requires that rail carriers furnish "adequate car service and establish, observe, and enforce reasonable rules and practices on car service." 49 U.S.C. § 11121(a)(1) (1988). Congress did not further elucidate the requisites of the common carrier obligations, leaving to the Commission and the courts the task of clarifying, on a case-by-case basis, a more precise definition of "reasonable request," "adequate car service," and "reasonable rules and practices."

The specific restrictions on the use of rail contracts is instructive as to the understanding of Congress concerning the common carrier obligations. The forty percent restriction on the total equipment a carrier may dedicate to contract service provides assurance that a carrier will still have sufficient equipment to meet reasonable requests for conventional service. The restriction on rail car capacity for which certain large shippers might contract provides assurance that limited rail equipment can be equitably distributed among all shippers. The explicit power of the Commission to deny approval to any contract provides assurance that unforeseen infringements on the common carrier obligations might be rectified. Thus, with these restrictions, section 11101(a) also provides that "[a] rail carrier shall not be found to have violated this section because it fulfills its commitments under contracts approved under section 10713 … before responding to reasonable requests for service." There is no similar admonishment regarding carriers who give preference to special tariff shippers over reasonable requests for service.

Indeed, the statutory authority allowing carriers to establish special tariffs was enacted with the express legislative understanding that it would not adversely affect a carrier's ability to fulfill its common carrier obligation. The conference report specifically notes that "the common carrier obligation is not abrogated in any way. This will insure that the shipper is still guaranteed the same level of service that he receives today." Conference Report, 1980 U.S.C.C.A.N. at 4150.

The petitioners argue that Congress thus intended a carrier's conventional service to remain virtually identical to the service provided before the offering of a special tariff. We disagree. Rail service under a carrier's conventional tariff program need not be identical to that service before the introduction of special tariffs, but the conventional service

---

**3.** The report of the Commission's Office of Economics, on which the Commission relied, suggests that shortages are neither frequent nor persistent. 8 I.C.C.2d at 452. It does not challenge the evidence in the record of shortages caused by large export sales, but relies on *Grain Car Supply—Conference of Interested Parties*, 7 I.C.C.2d 694 (1991), in which the Commission found rail car shortages during domestic harvests to have been virtually eliminated. The instant case does not require that we determine the exact degree, frequency, or duration of shortages; we look rather to how the COT program affects conventional tariff shippers when grain cars are in short supply.

must at all times meet the requirements of the common carrier obligations. When presented with such a case as this, therefore, the Commission must determine whether the opportunity for shippers to use conventional rail transport remains reasonable. In the instant case, the Commission failed to make that determination.

■■■ The Commission here concluded that the "general common carrier obligation as currently defined" requires only that a carrier "maintain a fleet sufficient to meet average demand." 8 I.C.C.2d at 427. The Commission further observed that a "requirement for a fleet sufficient to meet peak demand would result in a wasteful surplus of equipment detracting from the carrier's long term financial health." *Id.* We find that the Commission's ruling regarding fleet size is a permissible construction of the statute. The common carrier obligations, however, involve much more than maintenance of sufficient fleet size. The Commission must also examine how the common carrier allocates the resources of that fleet: Are the procedures for distribution of the fleet reasonable and fair, and is the distribution equitable? Does the carrier provide adequate service on reasonable request?

In this case, the Commission failed to resolve these issues. The Commission did acknowledge the question of equitable distribution, but it failed to respond with appropriate findings of fact and legal analysis. Rather, it improperly rejected the claim on an extraneous basis: "We do not think that [petitioner] has shown that the COT program enables or causes [Burlington Northern] to breach its obligation to distribute cars equitably. There is nothing about the COT program that excludes particular classes of shippers." *Id.* at 429. Notwithstanding the questionable

finding that the COT program does not exclude particular classes of shippers,[4] a finding that non-COT shippers could participate in the COT program still fails to address whether conventional, non-COT shippers receive an equitable distribution of rail cars.

The Commission makes the same mistake in its analysis of the common carrier obligation to provide cars on reasonable request:

> Nor has [petitioner] shown that [Burlington Northern] has violated its common carrier duty to provide cars on reasonable request.... The fact that the COT process reduces the numbers of cars available during shortages for non-COT shippers, again, does not show that the COT program is unlawful. Moreover, shippers dissatisfied with the quality of non-COT service can bid on COTs.

*Id.* at 430. The Commission errs here in two ways. First, if the COT process so reduces the numbers of cars available during shortages for non-COT shippers that it unduly impairs Burlington Northern's ability to meet its common carrier obligations, then it *does* show that the COT program is unlawful. Second, the Commission again suggests that if the quality and reasonableness of non-COT service is a problem, shippers can resolve the problem simply by bidding on the special COT service.

Evidence in the record suggests that non-COT shippers endure unreasonable delays in receiving car service during shortages. That these shippers might feasibly switch to the premium tariff COT service is not the relevant inquiry; rather, the Commission must determine if the COT program so affects the service for conventional shippers as to violate Burlington Northern's common carrier obligation to provide equitable and adequate car service on reasonable request.

---

4. This finding appears to be based on the unsupported conclusions of the Commission's Office of Economics. Petitioners had argued that many small elevators could not afford to use the COT program because of the required premiums and non-refundable down payments. The Office of Economics analysis summarily rebuffed the argument, concluding that even the smallest shippers "are going concerns with expertise, resources, and established lines of credit," 8 I.C.C.2d at 459, and that "this established system could easily adapt—and, indeed, probably has adapted in

some instances—to providing certain additional financing for COT down-payments." *Id.* at 459 n. 34. There appears to be no supportive factual finding for this conclusion. Indeed, evidence in the record does suggest the COT program is not suited for the shipping needs of many shippers. *See, e.g.,* Verified Statement of North Dakota Public Service Commission, App. at 0400; Verified Statement of John F. Mittleider, North Dakota Barley Council, App. at 0495; Verified Statement of Jon H. Mielke, App. at 0509.

To be clear, we stress that Congress intended the common carrier obligations to continue to apply to a rail carrier's conventional tariff service—that is, to its common carriage. Although a rail carrier also may offer other forms of service through contracts or premium tariffs, no shipper must avail itself of these special offerings simply to receive common carriage. Thus, the special service may not so adversely affect the carrier's conventional tariff service as to prevent or frustrate its ability to meet its common carrier obligations through that conventional tariff service.

In concluding that Burlington Northern meets its common carrier obligations because its COT premium tariff program is available to all shippers, the Commission erred. It must rather determine whether Burlington Northern meets its common carrier obligations to shippers who might choose to use only its conventional tariff service. Specifically, the Commission must determine the following: Does the COT program adversely affect Burlington Northern's conventional tariff rail service? If so, does Burlington Northern fail as a consequence to provide equitable service to any of its conventional tariff shippers? Does it fail to provide adequate service to its conventional tariff shippers? Does it fail to provide service on reasonable request to its conventional tariff shippers? Does the COT program render Burlington Northern's first-come-first-served allocation scheme unreasonable for conventional tariff shippers? Does Burlington Northern fail in any way to meet its common carrier obligations to its conventional shippers because of its COT program?

## IV

We reverse the holding of the Commission that Burlington Northern's COT program does not infringe its common carrier obligations and remand for further proceedings consistent with this opinion. We affirm the decision of the Commission in all other respects.

BEAM, Circuit Judge, concurring and dissenting.

Congress discovered that America's rail transportation system was being regulated out of business by the Interstate Commerce Act. In response, it enacted the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895, which, as the court notes, specifically authorizes railroads to enter into special contracts for rail transportation services. Burlington Northern (BN), under this authorization, developed this Certificate of Transportation (COT) program in an effort to more efficiently, and profitably, use its fleet of grain cars, while, at the same time, fulfilling its common carrier obligation to all shippers. In this adversary proceeding, the Interstate Commerce Commission (ICC) found that BN's effort was successful. This court, in violation of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) says, maybe not. With this, I disagree.

The court concedes that Congress has given the ICC "the task of clarifying, on a case-by-case basis" what railway service is necessary to meet a common carrier's obligation. The majority states, *supra* at 8, that this court has a role in that task. The statute and the admonitions of *Chevron* are to the contrary. "[I]f the statute is ... ambiguous with respect to the specific issue, [the requirements of the common carrier obligation] the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. The contours of the common carrier obligation are not clearly defined in the Interstate Commerce Act. It is, thus, an ambiguous term left to interpretation by the ICC. Here, the Commission has determined that the obligation has been met by BN. On the facts adduced, this is clearly a permissible decision. We have no basis for interference. Accordingly, I would affirm the decision of the ICC.