**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**
No. 97-1707

GS Roofing Products Company;          *
Beazer West, doing business as        *
Gifford-Hill & Company, Inc.;         *
Bean Lumber Company;                  *
Curt Bean Lumber Company,             *
                                      *
          Petitioners,                *
                                      *
     v.                               *     Petition for Review of an
                                      *     Order of the Surface
Surface Transportation Board,         *     Transportation Board.
                                      *
          Respondent,                 *
                                      *
United States of America,             *
                                      *
          Respondents,                *
                                      *
Arkansas Midland Railroad             *
Company, Inc.,                        *
                                      *
          Intervenor on Appeal.       *

_____

Submitted:  September 8, 1997

Filed:  April 24, 1998

_____

Before FAGG, LAY, and WOLLMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

We have before us once again the Arkansas Midland Railroad Company, Inc. (Arkansas Midland), which is a short line railroad operator in southwestern Arkansas. In Caddo Antoine and Little Missouri R.R. Co. v. United States, 95 F.3d 740 (8th Cir. 1996), we reversed the Surface Transportation Board's decision denying Caddo Antoine's application to purchase the entire length of Arkansas Midland's Norman Branch and remanded the case to the Board for further proceedings.

In the present case, the petitioners, GS Roofing Products Company, Inc. (GS Roofing), Beazer West, Inc., d/b/a Gifford-Hill & Company (Gifford-Hill), Bean Lumber Company (Bean Lumber), and Curt Bean Lumber Company (Curt Bean Lumber) (collectively referred to as "the shippers"), are four of the six shippers located on the Norman Branch. Petitioners filed a complaint with the Interstate Commerce Commission (ICC), asserting that the Arkansas Midland violated its statutory common carrier obligation by refusing to provide service upon reasonable request.[1] The Board, acting in accordance with section 204(c)(2) of the ICC Termination Act (ICCTA), denied petitioners' claim. Petitioners appeal pursuant to 28 U.S.C. §§ 2342 and 2321. We reverse and remand.

## I.

As discussed in our earlier opinion, the Norman Branch extends from its point of interchange with what was previously the Missouri Pacific Railroad (now part of the

---

[1]After the petitioners filed their complaint with the ICC, that agency was abolished by Section 101 of the ICCTA, Pub.L. No. 104-88, 109 Stat. 803 (effective January 1, 1996). Section 201 of the ICCTA establishes the Surface Transportation Board, and section 204(c)(2) provides that the Board shall continue any suit brought by or against the ICC to the extent that the suit involves functions that have been transferred to the Board.

Union Pacific Railroad) at milepost 426.3 near Gurdon, Arkansas, to milepost 479.2 near Birds Mill, Arkansas. In February of 1992, Arkansas Midland acquired the Norman Branch from Union Pacific and began serving the various shippers located on the line. See Caddo Antoine, 95 F.3d at 741.

Arkansas Midland operated the Norman Branch as "excepted" track under Federal Railroad Administration (FRA) guidelines. These guidelines prescribe minimum track safety standards for railroads. See 49 C.F.R. Part 213 (1996). Under the FRA guidelines, Class I standards require that track be maintained at such levels as to permit safe freight operations at speeds of up to ten miles per hour. See 49 C.F.R. § 213.9. Prior to 1982, railroads were required to maintain their tracks at Class I level in order to continue operations. In 1982, however, the FRA adopted the excepted track designation. See 49 C.F.R. § 213.4. In certain circumstances, this designation permits a railroad to continue operations on track that does not comply with minimum Class I standards by designating it as excepted track.[2] This was the case with the Norman Branch.

On December 3, 1993, a storm caused washouts at mileposts 475.9 and 477.2, which are located near the northern tip of the Norman Branch. On December 15, 1993, Arkansas Midland announced an embargo of all rail shipments to the four northernmost shippers on the branch, including GS Roofing, Bean Lumber, and Curt Bean Lumber.[3] On February 22, 1994, this embargo was extended to terminate service to Gifford-Hill. Arkansas Midland continued to provide service to the sixth and southernmost shipper

_____

[2]Track which has been designated as excepted track is subject to the following use limitations: (1) no train may be operated at speeds in excess of ten miles per hour; (2) no revenue passenger train may be operated; and (3) no freight train containing more than five cars required to be placarded by the Hazardous Materials Regulations may be operated. See 49 C.F.R. § 213.4.

[3]An additional shipper, Barksdale Lumber Company, was also embargoed on this date but is not a party to this proceeding.

on the branch, International Paper Company (International Paper). The railroad explained the embargo by maintaining that the washouts and the continuing overall deterioration of the line had rendered operations unsafe on the embargoed portion.

After receiving notice of the embargo, the embargoed shippers entered into a series of negotiations with Arkansas Midland in an attempt to restore railroad service on the Norman Branch. Arkansas Midland estimated that it would cost $1.6 million to rehabilitate the embargoed portion of the line to Class I standards. In addition, the railroad estimated that the more seriously damaged bridge components on the line would require expenditures of $100,000 to $200,000.[4] Arkansas Midland sought aid from the Federal and State governments, Union Pacific, and the shippers. Although it secured rehabilitation commitments from Pinsley Railroad Company, Inc. (of which it is a subsidiary) and from Union Pacific totaling some $1.1 million, Arkansas Midland, believing that it needed at least an additional $500,000, refused to restore service on the line.

As recounted in our earlier opinion, see Caddo Antoine, 95 F.3d at 742, the shippers took three related actions in response to the continuing embargo. First, they requested that the Caddo Antoine and Little Missouri Railroad Company file a feeder line application in order to acquire the entire Norman Branch from Arkansas Midland. Second, the shippers asked Caddo Antoine to file an emergency petition with the ICC requesting a directed service order allowing Caddo Antoine to begin immediate operations over the line.[5] Finally, on March 21, 1994, the shippers filed the complaint

_____

[4]Arkansas Midland apparently based its estimates at least in part on a FRA safety report dated March 2, 1994. This report identified approximately 85 areas in which the Norman Branch failed to comply with minimum Class I standards.

[5]On April 1, 1994, a service order was granted authorizing Caddo Antoine to begin operations on the line. After spending some four hours in repairing the washouts and other storm damage at a cost of some $10,000, Caddo Antoine continued operating on the line until September 1994, when another carrier took over at Caddo Antoine's

that gave rise to this appeal, seeking damages sustained during the period from December 15, 1993, to the mid-April 1994 resumption of service.

In their complaint, the shippers contended that by refusing to resume service Arkansas Midland violated its common carrier duty under 49 U.S.C. § 11101(a). Section 11101(a) provides, in pertinent part, "A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission . . . shall provide the transportation or service on reasonable request."[6] The shippers claimed that because the continued embargo was unreasonable, it failed to excuse the carrier's refusal to provide service. On March 5, 1997, the Board issued a decision rejecting the shippers' claim, finding that the embargo was reasonable and that it excused Arkansas Midland's refusal to provide service. It is from this decision that the shippers appeal.

## II.

We are mindful of the narrow standard that governs our review of the Board's decision. We are obliged to give considerable deference to the Board's interpretation of the statutes and regulations it is entrusted to administer. See Nat'l Grain and Feed Ass'n. v. United States, 5 F.3d 306, 308-09 (8th Cir. 1993). We will not disturb the Board's decision absent compelling indications that the Board's interpretations were incorrect. See Caddo Antoine, 95 F.3d at 746. We may "ask only whether, in those cases in which Congress has not directly addressed the precise question at hand, the

_____

request. Operations continue to this day.

[6]The current language of 49 U.S.C. § 11101(a) differs slightly from that which was in effect prior to the ICCTA. Section 204(b)(1) of the ICCTA provides that proceedings pending before the ICC prior to January 1, 1996, shall be determined in accordance with prior law if the ICC's functions related thereto were transferred to the Board. All references in this opinion to section 11101(a) will be to the former section 11101(a) rather than to the current section 11101(a).

[Board's] action 'is based on a permissible construction of the statute.'" Id. (quoting Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984)). Notwithstanding this narrow standard of review, we are nevertheless obligated to ensure that "proper legal standards were correctly applied." City of Cherokee v. I.C.C., 641 F.2d 1220, 1226-27 (8th Cir. 1981).

The statutory common carrier obligation imposes a duty upon railroads to "provide [ ] transportation or service on reasonable request." 49 U.S.C. § 11101(a). This duty reflects the well-established principle that railroads "are held to a higher standard of responsibility than most private enterprises." General Foods Corp. v. Baker, 451 F. Supp. 873, 875 (D. Md. 1978). See also Ethan Allen, Inc. v. Maine Cent. R.R. Co., 431 F. Supp. 740, 742-43 (D. Vt. 1977) (noting that "the quasi-public nature of railroads entails a higher degree of public responsibility than is required of most private corporations"). Thus, a railroad may not refuse to provide services merely because to do so would be inconvenient or unprofitable. See General Foods, 451 F. Supp. at 875; Ethan Allen, 431 F. Supp. at 743. In addition, a railroad may not unilaterally abandon a line at its own election; it must instead apply for and receive permission from the proper administrative agency. See General Foods, 451 F. Supp at 875-76.

Nonetheless, the common carrier obligation is not absolute. See I.C.C. v. Baltimore & Annapolis R.R. Co., 398 F. Supp. 454, 467 (D. Md. 1975). A valid embargo will relieve a carrier of its obligation to provide service. See I.C.C. v. Chicago, Rock Island, & Pacific R.R. Co., 501 F.2d 908, 911 (8th Cir. 1974). An embargo is "an emergency measure placed in effect because of some disability on the part of the carrier which makes the latter unable properly to perform its duty as a common carrier." Chicago N.W. Ry. Co. v. Union Packing Co., 373 F. Supp. 734, 736-37 (D. Neb. 1974) (quoting Froehling Supply Co. v. United States, 194 F.2d 637, 641 (7th Cir. 1952)). An embargo is generally a temporary measure that is issued at the carrier's election. See Baltimore & Annapolis, 398 F. Supp. at 462; General Foods,

451 F. Supp at 876. Embargoes are typically valid if justified by physical conditions such as weather and flood damage, tunnel deterioration, or lack of equipment. See General Foods, 451 F. Supp. at 876.

Thus, a valid embargo is an appropriate defense to an action for a breach of the common carrier's duty. Although a valid embargo excuses the service obligation, it does not terminate the carrier's duty. Gibbons v. United States, 660 F.2d 1227, 1234 (7th Cir. 1981). To be valid, an embargo must be at all times reasonable. If the disability that prevented the carrier from performing its duty is eliminated or if the carrier is financially able to remedy the disability, the embargo becomes unreasonable and will no longer be valid. See Ethan Allen, 431 F. Supp. at 743; Baltimore & Annapolis, 398 F. Supp at 463. If an embargo becomes unreasonable, the carrier is no longer excused from its duty to provide service and may be liable for damages. See id. at 467.

The Board employed a balancing approach in reaching its decision that the embargo was reasonable and thus precluded the shippers' actions for damages. Under this approach, the Board considered the following factors: (1) the cost to repair the railroad; (2) the intent of the railroad; (3) the length of the embargo; (4) the amount of traffic on the line; and (5) the financial condition of the carrier. See Louisiana Railcar, Inc. v. Missouri Pacific R.R. Co., 5 I.C.C.2d 542, 544 (1989); Overbrook Farmers Union Coop. Ass'n -- Petition for Declaratory Order, 5 I.C.C.2d 316, 320 (1989). After balancing these factors, the Board found that the circumstances precipitating the embargo justified its initial and continued imposition.

**III.**

The reasonableness of an embargo involves a fact-specific inquiry and is to be determined on a case-by-case basis. Thus, the general balancing approach taken by the Board was appropriate. Nevertheless, we conclude that the Board's application of that approach resulted in a decision that undermines the policy considerations that are the foundation of the statutory common carrier obligation.

The Board found that the initial imposition of the embargo was reasonable because of damage caused by the December 3, 1993, storm. See GS Roofing Prod. Co., Inc., et al., v. Arkansas Midland R.R., et al., S.T.B. Docket No. 41230 (Decision), at 9 (March 5, 1997). We have no quarrel with this finding, for indeed there were some washouts at mile posts 477.2 and 475.9, in addition to other damages resulting from the storm. An embargo, however, is an emergency measure that is justified where physical conditions prevent a carrier from providing service. See Chicago, Rock Island, & Pacific, 501 F.2d at 911. If such conditions can be easily rectified, the embargo will not be valid beyond a reasonable time necessary to restore services. See Ethan Allen, 431 F. Supp. at 744. The cost of repairing a line to safe operating condition, and the carrier's ability to physically and financially carry out such repairs, are keys to the continuing reasonableness of an embargo. See id. (finding embargo unreasonable where railroad was "financially and physically able to repair the damage and resume service").

The Board held that the proper standard for assessing the cost of repair was the expense of rehabilitating the line to Class I standards. See Decision at 10. The Board concluded that "Class I standards represent the minimum level of safety compliance at which a carrier can be required to operate" and are "therefore the appropriate level to be used in a typical embargo proceeding." Id. The Board then applied this standard in assessing the cost of repairing the Norman Branch. Citing an FRA report that identified numerous areas in which the line did not conform to Class I standards, and

-8-

relying on Arkansas Midland's estimation that the cost of Class I rehabilitation would be approximately $1.6 million, the Board held that the physical conditions necessitating the embargo could not be easily rectified and that the embargo was therefore reasonable.

We conclude that the Board erred in employing Class I standards in assessing the cost of repairing the Norman Branch. Arkansas Midland had never operated the Norman Branch as Class I track. Instead, the line had at all times been designated and operated as excepted track. Although it may have been necessary to spend $1.6 million to bring the line up to Class I standards, such a project would have been an upgrade rather than a restoration. The proper standard for assessing the cost of repair should focus on the cost of resuming services at pre-embargo levels.

At the very heart of the common carrier obligation is the belief that railroads are in a position of unique public trust. They are therefore held to higher standards of responsibility than other private enterprises. See General Foods, 451 F. Supp. at 875; Ethan Allen, 431 F. Supp at 742-43. The common carrier obligation reflects a strong public policy that carriers should not unilaterally cease operations absent exigent circumstances. The Board's decision allows a carrier that operates at an excepted level to cease operations unilaterally simply because upgrading its line to Class I standards would be impractical and unaffordable. This notion is inconsistent with the policies underlying the common carrier obligation. Moreover, the Board's present position is in direct conflict with its holding in Louisiana Railcar, in which it stated that "[r]ehabilitation to Class I standards was clearly not necessary to return the line to service. The line was satisfactorily operated at excepted track levels prior to the embargo." 51 I.C.C.2d at 544.[7]

_____

[7]The Board distinguished Louisiana Railcar in the present case by pointing to the fact that in that case the line had been satisfactorily operated at excepted track levels prior to the embargo and that the $18,000 cost of restoring the line to service was an amount that its owner, the Missouri Pacific, a large Class I railroad, could afford. Granted the difficulties encountered in doing so, the Norman Branch was also being

-9-

We do not mean to minimize the sorry state of track conditions on the Norman Branch. There is no question but that the line was marginally operated before the storm damage and was in need of repair. Nevertheless, the record shows that service on the track could have been restored at pre-embargo levels for far less than $1.6 million. As set forth above, when Caddo Antoine began operations in early April 1994 pursuant to the service order, it was required to spend only four hours and only some $10,000 in repairing the washouts before resuming service. Whether or not Arkansas Midland could have repaired the damage in precisely the same time and for exactly the same amount of money, it is clear that it could have resumed operations at excepted levels for a fraction of the cost of a Class I rehabilitation program, as is demonstrated by the fact that operations have continued on the line since April 1994 despite the absence of a Class I rehabilitation project.

The Board found that the minor repairs made by Caddo Antoine represented a "band aid" approach that did not address the rehabilitation of the line. See Decision at 12. The Board held that because rehabilitation was essential to the long-term success of the Norman Branch, Arkansas Midland cannot be required to make the minor repairs that would keep the track in present operation. See id. The Board's preoccupation with the long term profitability of the Norman Branch is misplaced, however, for notions of long-term feasibility have no place in a proceeding to determine the reasonableness of an embargo. An embargo becomes unreasonable if a railroad is physically and financially able to resume services. See Chicago, Rock Island, & Pacific, 501 F.2d at 911; Ethan Allen, 431 F. Supp. at 743; Baltimore & Annapolis, 398

operated at excepted track levels prior to the embargo. Although the cost of restoration would have been a substantially greater financial burden to Arkansas Midland than the $18,000 was to the Missouri Pacific, it would not have been beyond Arkansas Midland's capacity to fund, especially in view of the financial commitments it had received from the Union Pacific and from its owner.

F. Supp. at 463. This is true regardless of the long-term prospects of a particular line. If service can be resumed at safe levels without substantial expenditures of time or money, a railroad should not be permitted to refuse to resume service simply because extensive improvements might be necessary for the long-term success of the line.

Because an embargo is a temporary measure that is justified only if the condition warranting the embargo cannot reasonably be rectified, the continuing reasonableness of an embargo should be determined by analyzing the cost of resuming service at pre-embargo levels. In view of the fact that Arkansas Midland had received commitments for funds and materials having a value of more than $1 million, we think it clear that it could well have afforded to resume interim operations by making a few fairly minor and inexpensive repairs.

The Board also found that Arkansas Midland's financial condition and the unprofitable nature of operations on the Norman Branch justified the embargo. The Board found that Arkansas Midland acted prudently in deciding not to commit funds to the Norman Branch because there was little chance that the embargoed portion could be successfully and profitably operated. See Decision at 13-14. The Board cited a number of cases for the proposition that a carrier cannot be required to spend money on substantial rehabilitation where operations will be unprofitable and that to require a carrier to operate at a loss constitutes a "taking" under the Due Process Clause. See id., (citing Purcell v. United States, 315 U.S. 381, 385 (1942); Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 325 (1981); Brooks-Scanlon Co. v. Comm'n of Louisiana, 251 U.S. 396, 397-99 (1920); Bullock v. R.R. Comm'n of Florida, 254 U.S. 513, 520-21 (1921); R.R. Comm'n of Texas v. Eastern Texas R.R., 264 U.S. 79, 85 (1924)).

These cases deal with considerations of present and future profitability in the context of abandonment proceedings. Profitability of a railroad operation is a proper consideration in determining whether public necessity and convenience permit the

granting of approval to abandon.  See Georgia Public Serv. Comm'n v. United States, 704 F.2d 538, 541 (11th Cir. 1983) (citing Purcell, 315 U.S. at 384).  Here, however, we are not dealing with a case in which a railroad is seeking to abandon a line.  The sole question before the Board was whether Arkansas Midland's embargo was reasonable.  An embargo may not be justified "solely on the grounds that to continue to provide service would be inconvenient or less profitable."  Ethan Allen, 431 F. Supp. at 743.

Arkansas Midland asserts that the storm damage to the Norman Branch left it  with only two options: to embargo the line or to undertake a $1.6 million Class I rehabilitation.  As the record reveals, however, Arkansas Midland could have made minor interim repairs that would have allowed the line to operate as it had.  To make those repairs would not have required Arkansas Midland to incur substantial costs in either time or money.  In the meantime, the railroad was free to explore its long-term options, including the possibility of selling the line, pursuing abandonment proceedings, or raising funds for a rehabilitation project.

We conclude that the Board's decision flies in the face of the uncontroverted evidence that Arkansas Midland could have restored service on the line in short order and at relatively minor expense.  Having failed to restore service within a reasonable time, Arkansas Midland is liable to the shippers for such damages as they suffered during the period starting on the date on which the line should have been restored to service following the imposition of the embargo and ending on the date service was actually restored.

The decision appealed from is reversed, and the case is remanded to the Board for a determination of damages consistent with the views set forth in this opinion.

LAY, Circuit Judge, dissenting.

The majority's opinion represents a departure from basic principles of administrative law. By stating that the Surface Transportation Board cannot use Class I standards in this case, the majority overlooks the specialized expertise of the Board in assessing the reasonableness of the Arkansas Midland embargo. It is for the Board to determine what Federal Railroad Administration standards should govern an embargo proceeding. As the Board observed:

> [C]lass 1 standards are the FRA's <u>minimum</u> standards; they are the lowest standards to which the ICC and now the Board have looked in assessing rehabilitation costs in abandonment cases; and, notwithstanding the fact that a carrier may, in unusual circumstances, seek (at its own election) to operate under excepted standards, class 1 standards represent the minimum level of safety compliance at which a carrier can be required to operate. <u>They are therefore the appropriate level to be used in the typical embargo proceeding</u>. (emphasis added).

<u>GS Roofing Prod. Co. v. Arkansas Midland R.R.</u>, No. 41230, 1997 WL 104290, at *6 (I.C.C. March 5, 1997).

The law is well-settled that an administrative body such as the Board is entitled to great deference in its construction of the statutes that it is charged with administrating. <u>See, e.g.</u>, <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 842-43 (1984) (unless a law is clear and explicit, a court must limit its inquiry to determining whether an agency's interpretation "is based on a permissible construction of the statute.") When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts <u>must</u> give the agency's decision controlling weight unless it is arbitrary, capricious, or manifestly contrary to statute. <u>See</u> <u>ABF Freight System, Inc. v. N.L.R.B.</u>, 510 U.S. 317, 324

(1994). An administrative agency ruling is arbitrary or capricious only if the agency has failed entirely to consider important aspects of a problem. See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992); see also Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983) ("[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

In the present case, the Board, as the reviewing agency, reached an entirely permissible interpretation of the statute governing Arkansas Midland's common carrier obligation, 49 U.S.C. § 11101(a), and this determination hardly was reached in an arbitrary or capricious manner. The balancing test employed in this case previously has been used by the Board and its predecessor, the Interstate Commerce Commission, to determine the reasonableness of rail embargoes. See, e.g., Overbrook Farmers, 5 I.C.C.2d 316; Louisiana Railcar, 5 I.C.C.2d 542. The Board's written decision thoroughly explains the basis for its findings, and touches on all of the balancing test factors articulated in Overbrook Farmers and Louisiana Railcar. For this reason, the shippers' claim that the Board erred in its decision amounts to little more than an impermissible call for this Court to reweigh previously evaluated evidence.

The majority, however, finds the Board erred as a matter of law in employing Class I standards to assess the cost of repairing the Norman Branch. The proper standard for assessing costs, the majority concludes, should focus on resuming service to pre-embargo levels. It reasons that, because the line was operated satisfactorily as excepted track prior to the embargo, restoring service to the excepted track level is the only cost assessment the Board may legitimately consider.

I believe the majority's holding is erroneous for several reasons. First, there is nothing beyond the majority's singular notions of right and wrong that mandates costs

-14-

may only be evaluated in regard to restoration of pre-embargo service levels. In Louisiana Railcar, the ICC held that Class I standards were not necessary to return the line to service in the case before it because "[t]he line was satisfactorily operated at excepted levels prior to the embargo." 5 I.C.C.2d at 546. By contrast, the Board found on the Norman Branch that "the operations -- which involved very heavy shipments moving over very dangerous track -- were marginal before the embargo, as reflected by the numerous derailments that occurred (and have continued to occur)." GS Roofing, 1997 WL 104290 at *6 n.39.

By finding that Louisiana Railcar forecloses the Board from assessing costs under Class I standards, the majority ignores a key premise stated in its own analysis: "The reasonableness of an embargo involves a fact-specific inquiry and is to be determined on a case-by-case basis." See supra, part III. In Louisiana Railcar, the ICC found that the railroad's embargo was not reasonable, because the line had been satisfactorily operated at excepted levels, and $18,000 for restoration was "an amount that [the railroad], a large Class I carrier, could afford." 5 I.C.C.2d at 546. As the Board's inquiry revealed, that particular set of facts does not apply in this case, and therefore the reasonableness of the carrier's actions cannot be justifiably assessed by the same rigid, uniform standard.

This is why, as the majority recognizes, each embargo must be assessed on a case-by-case basis, and why it is a mistake for the Court to dictate to the Board what standard it must employ. As long as the standard is not used in an arbitrary or capricious manner, the Board is acting within its administrative discretion.

Second, the majority erroneously concludes that "[t]he Board's decision allows a carrier that operates at an excepted level to cease operations unilaterally simply because upgrading its line to Class I standards would be impractical or unaffordable." See supra, part III. This statement overlooks the fact that costs of repair is only one of five factors the Board considered as part of a clearly articulated balancing test.

Other factors -- length of the embargo, the carrier's intent, the amount of traffic on the line, and the financial condition of the carrier -- were all considered by the Board to assess the reasonableness of Arkansas Midland's embargo. In other words, the Board's assessment of costs in this case would not allow any carrier to "cease operations unilaterally," because it is always possible that costs of an upgrade may be outweighed by other factors that render the carrier's actions unreasonable.

Finally, I believe the majority's ruling loses sight of the basic question the Board was charged with answering: Were the actions of the carrier objectively <u>unreasonable</u> in light of the information available at the time of the embargo. I do not understand how this Court can find that the Board abused its discretion by concluding that it was reasonable for a small, cash-strapped carrier like Arkansas Midland to calculate the long-term costs of rehabilitation in making its embargo decision. The majority implies that the common-carrier obligation is breached unless a railroad employs all necessary means to restore limited service, regardless of the condition of the track, and regardless that such actions may equate to tossing money down a bottomless pit. Not only is such a result contrary to good economic sense; it is contrary to Supreme Court precedent that a carrier cannot be required to expend money it can never recover on an unsuccessful rail line. <u>See</u> <u>Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.</u>, 450 U.S. 311, 325 (1981) ("The duty to provide [rail service] is not absolute, and the law exacts only what is reasonable of the railroads under the existing circumstances.") (internal quotations omitted); <u>Purcell v. United States</u>, 315 U.S. 381, 385 (1942) ("When materials and labor are devoted to the [re]building of a line in an amount that cannot be justified in terms of the reasonably predictable revenues, there is ample ground to support a conclusion that the expenditures are wasteful whoever foots the bill.").

The Supreme Court recently reiterated: "If the agency's reading [of a statute] fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer the court would have

reached if the question initially had arisen in a judicial proceeding.'" <u>Regions Hosp. v. Shalala</u>, __ U.S. __, 118 S. Ct. 909, 915 (1998) (quoting <u>Chevron U.S.A.</u>, 467 U.S. at 843, n. 11.)  I respectfully submit that this well-established deference to administrative determinations is slighted by the majority ruling.  Even if the Board's answer is not the same the Court would have reached, substitution of the Board's expertise is not an appropriate exercise of the Court's appellate power.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.