# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3218

_____

GS Roofing Products Company, Inc;      *
Hanson Aggregates West, formerly       *
known as Gifford-Hill & Company, Inc.; *
Bean Lumber Company; Curt Bean         *
Lumber Company,                        *
                                       *
          Petitioners,                 *
                                       *
     v.                                *
                                       *  Petition for Review
Surface Transportation Board; United   *  of an Order of the
States of America,                     *  Surface Transportation Board.
                                       *
          Respondents,                 *
                                       *
Arkansas Midland Railroad Company,     *
                                       *
          Intervenor on Appeal.        *

_____

No. 00-2213

_____

GS Roofing Products Company, Inc;      *
Hanson Aggregates West, formerly       *
known as Gifford-Hill & Company, Inc.; *
Bean Lumber Company; Curt Bean         *
Lumber Company; Dardanelle &           *
Russellville Railroad Company; East    *
Texas Central Railroad Company,        *
                                       *
          Petitioners,                 *

|  |  |
|---|---|
|  | * |
| v. | * |
|  | * |
| Surface Transportation Board; United States of America, | * |
|  | * |
|  | * |
|  | * |
| Respondents, | * |
|  | * |
| Arkansas Midland Railroad Company, | * |
|  | * |
| Intervenor on Appeal. | * |

_____

No. 00-2740
_____

|  |  |
|---|---|
| Arkansas Midland Railroad Company, | * |
|  | * |
| Petitioner, | * |
|  | * |
| v. | * |
|  | * |
| Surface Transportation Board; United States of America, | * |
|  | * |
|  | * |
| Respondents, | * |
| _____ | * |
|  | * |
| GS Roofing Products Company, Inc.; | * |
| Hanson Aggregates West, Inc., formerly | * |
| known as Gifford-Hill & Company; | * |
| Bean Lumber Company; Curt Bean | * |
| Lumber Company; Dardanelle & | * |
| Russellville Railroad Company; East | * |
| Texas Central Railroad Company, | * |
|  | * |
| Intervenors on Appeal. | * |

_____

Submitted: January 10, 2001

Filed:  August 20, 2001
_____

Before WOLLMAN, Chief Judge, FAGG, and HANSEN, Circuit Judges.
_____

WOLLMAN, Chief Judge.

This is the third time we have been called upon to address disputes related to the Norman Branch, a 52-mile stretch of railroad in southwestern Arkansas.  On May 5, 2000, after extensive administrative proceedings and subsequent to our decisions in Caddo Antoine and Little Missouri Railroad Company v. United States, 95 F.3d 740 (8th Cir. 1996) (Caddo Antoine) and GS Roofing Products Company v. Surface Transportation Board, 143 F.3d 387 (8th Cir. 1998) (GS Roofing I), the Surface Transportation Board (Board) consolidated and issued rulings on three cases involving the Norman Branch.  First, pursuant to the feeder line provisions now found in 49 U.S.C. § 10907, the Board ordered the Arkansas Midland Railroad Company (AMR) to sell the Norman Branch to the Caddo Antoine and Little Missouri Railroad Company (Caddo Antoine), a noncarrier subsidiary of the Dardanelle & Russell Railroad Company, and set the purchase price at the net liquidation value of the entire line (the feeder line case).  Second, the Board set compensation for trackage rights on the southernmost three miles of the Norman Branch at $7.00 per car (the compensation case).  Finally, the Board found AMR liable to two shippers for damages in the amount of $192,564.60 (the damages case).  In this consolidated petition, we review each of the Board's holdings.  We affirm in part and reverse and remand in part.

# I.  BACKGROUND

## A.  Relevant Facts

Our recitation of the relevant facts relies heavily on our opinions in <u>Caddo Antoine</u> and <u>GS Roofing I</u>, as well as on the Board's summary of the background of this case in its May 5, 2000, decision.

AMR acquired the Norman Branch line from Union Pacific Railroad in 1992. The line extends from milepost 426.87, near Gurdon, Arkansas, to milepost 479.2, near Birds Mill, Arkansas.  The principal shipper on the line, International Paper Company (International Paper), is located approximately 3 miles from Gurdon, where the line connects at its southern end with Union Pacific's main line.  The line also serves GS Roofing Products Company, Inc. (GS Roofing), Hanson Aggregates West, Inc., previously known as Gifford-Hill & Company (Gifford-Hill), and Bean Lumber Company and Curt Bean Lumber Company (Bean Lumber) (collectively, the shippers). The shippers are all located on the northern part of the Norman Branch.

On or about December 3, 1993, a severe storm caused washouts at mileposts 475.9 and 477.2 of the Norman Branch.  On December 15, 1993, AMR announced that the resulting poor track conditions required it to embargo service to GS Roofing and to Bean Lumber.  AMR extended the embargo to Gifford-Hill on February 22, 1994. It continued to provide service to International Paper Company, however, over the southern section of the line.

After the embargo was imposed, the shippers entered into negotiations with AMR and Union Pacific in an attempt to restore service on the Norman Branch. Although Union Pacific offered financial assistance in excess of $1.1 million to aid in re-establishing service on the line, AMR concluded that it required at least an additional $500,000 to rehabilitate the Norman Branch and accordingly refused to make repairs

or restore service. In February of 1994, AMR indicated its intention to abandon the entire Norman Branch. Shortly thereafter, however, AMR determined that it would continue to provide rail service to International Paper by continuing to operate only the southernmost section of track.

The prospect of discontinuance of rail service to the shippers precipitated three related actions before the Interstate Commerce Commission (ICC).[1] First, at the request of the shippers, Caddo Antoine filed a feeder line application under 49 U.S.C. § 10907 (formerly 49 U.S.C. § 10910) to acquire the entire Norman Branch and resume service to the shippers (the feeder line case). Second, Caddo Antoine requested that the ICC issue a directed service order pursuant to former 49 U.S.C. § 11125 that would allow it to begin immediate operations over the entire Norman Branch (the compensation case). Third, the shippers filed a complaint against AMR seeking damages for injuries allegedly resulting from the embargo (the damages case).

After extensive administrative and judicial proceedings, as described below, the Board directed the parties to work with an administrative law judge in an attempt to reach a negotiated resolution of the three cases. On January 13, 1999, the shippers notified the Board that mediation attempts with the ALJ had failed and requested that the Board rule on the three pending cases. Accordingly, the Board consolidated the three cases and, on May 5, 2000, issued the decision giving rise to this appeal. We have jurisdiction pursuant to 28 U.S.C. § 2321(a) and § 2342(5).

---

[1] The ICC Termination Act of 1995 (ICCTA), Pub. L. No. 104-88, 109 Stat. 83, abolished the Interstate Commerce Commission effective January 1, 1996, and transferred certain of the ICC's responsibilities to the newly-formed Surface Transportation Board. The Act also modified certain of the statutory provisions relevant to this case. Section 204(b)(1) of the ICCTA provided, however, that proceedings pending before the ICC prior to January 1, 1996, should be determined in accordance with prior law if the ICC's functions related thereto were transferred to the Board. Accordingly, certain issues in this appeal are controlled by former provisions of the United States Code.

## B. Procedural History

### 1. The Feeder Line Case

The Staggers Rail Act of 1980, now codified at 49 U.S.C. § 10907, was enacted to address concerns about the deteriorating rail service provided on some of the secondary railroad lines throughout the country. Caddo Antoine, 95 F.3d at 744. In furtherance of this goal, Congress authorized the Board, under particular circumstances, to force the sale of a railroad line at its "constitutional minimum value" to a "financially responsible person." 49 U.S.C. § 10907(b)(1). The Act further provides that "the constitutional minimum value of a particular railroad line shall be presumed to be not less than the net liquidation value of such line or the going concern value of such line, whichever is greater." 49 U.S.C. § 10907(b)(2).

On March 18, 1994, in response to AMR's service embargo, Caddo Antoine filed a feeder line application for the forced sale of the Norman Branch. While this application was pending, AMR entered into a lease and option to purchase agreement with Glenwood & Southern Railroad Company for the northern portion of the line, the section providing service to the shippers. After the ICC disallowed this action, Glenwood & Southern filed a competing feeder line application for forced sale of the Norman Branch, which the ICC also denied. Thereafter, on April 18, 1995, the ICC partially granted Caddo Antoine's feeder line application, forcing the sale of the 49-mile northern portion of the Norman Branch, but refusing to direct the sale of the three-mile southern section of track that AMR was continuing to operate to provide service to International Paper. Caddo Antoine declined to acquire only part of the Norman Branch and petitioned for judicial review of the Board's decision. On September 13, 1996, we reversed the Board's attempt to bifurcate the line and remanded for further consideration of Caddo Antoine's application to purchase the entire Norman Branch. Caddo Antoine, 95 F.3d 740.

Accordingly, the Board reopened the feeder line proceedings and directed the filing of additional evidence related to Caddo Antoine's application to purchase the Norman Branch, including updated information on the constitutional minimum value of the line. In August of 1999, the Board granted Caddo Antoine's feeder line application for the sale of the Norman Branch, setting the purchase price at $1,628,727, which was the sum of the net liquidation value (NLV) of the northern portion of the line ($901,834) and the going concern value (GCV) of the southern portion of the line ($726,893).

AMR subsequently sought administrative reconsideration of the purchase price, arguing that the Board had underestimated the GCV of the southern segment of the line. The shippers also urged reconsideration, arguing that our holding in Caddo Antoine foreclosed the use of NLV for the northern part of the track and GCV for the southern portion of the line and, alternatively, that the Board had erred in calculating the GCV of the southern portion of the line.

In its May 5, 2000, decision, the Board reconsidered the purchase price of the Norman Branch and concluded that its initial calculation of the GCV of the southern portion of the line was inaccurate. The Board furthermore concluded that the supplemented record did not contain sufficient information to calculate an accurate GCV for the southern section of the Norman Branch. The Board also questioned the propriety, in light of our holding in Caddo Antoine, of combining the NLV of the northern part of the Norman Branch with the GCV of the southern portion of the line. Accordingly, the Board revalued the Norman Branch at the NLV of the entire line, setting the purchase price at $961,096.24.

## 2. The Compensation Case

In March of 1994, the ICC denied Caddo Antoine's request for directed service over the Norman Branch pursuant to former 49 U.S.C. § 11125, finding that Caddo

Antoine had failed to satisfy the statutory requirements. Instead, the Commission issued a service order authorizing Caddo Antoine to provide voluntary interim rail service over the northern portion of the Norman Branch, contingent on AMR's agreement and pursuant to former 49 U.S.C. § 11123(a). The ICC also authorized Caddo Antoine to contract with AMR to operate "overhead" trackage rights on the southern portion of the Norman Branch, thereby allowing Caddo Antoine to connect with the Union Pacific line and operate over the southern section of the tracks still owned and operated by AMR. The ICC ordered Caddo Antoine to compensate AMR for these trackage rights at a "commercially reasonable rate."

Caddo Antoine began operations in April of 1994 and continued until August of 1996, when the East Texas Central Railroad Company took over service. The railroads have been unable, however, to agree on a commercially reasonable rate of compensation for the trackage rights over the southern three miles of the Norman Branch. Initially, Caddo Antoine offered $1.75 per car, and subsequently it increased its offer to $3.72 per car. AMR sought payment of $7.00 per car. Eventually, at the urging of the ICC, Caddo Antoine petitioned the ICC to determine the commercially reasonable rate to be paid for trackage rights.

In June of 1995, the ICC directed the parties to submit evidence on the commercially reasonable value of trackage rights over the southern tip of the Norman Branch and determined that it would apply its standard formula in addressing the issue. In June of 1996, the Board, acknowledging that the evidence in the record was not entirely sufficient, set compensation at $9.75 per car. Caddo Antoine filed an administrative appeal, which the Board denied in September of 1996. Subsequent to our decision in Caddo Antoine, the Board reopened and stayed its orders in the compensation case. Finally, in its May 5, 2000, decision, the Board reaffirmed the use of its standard formula for determining trackage rights, but reduced compensation from $9.75 to $7.00 per car, the amount originally requested by AMR.

### 3. The Damages Case

As common carriers, railroads have an obligation to provide rail service upon reasonable request. 49 U.S.C. § 11101(a). This obligation is not absolute, however. GS Roofing I, 143 F.3d at 391-92. A valid embargo, defined as "an emergency measure placed in effect because of some disability on the part of the carrier which makes the latter unable properly to perform its duty as a common carrier," id. at 392, will relieve a carrier of its obligation to provide rail service, id. To be valid, an embargo must be reasonable. Id. If the Board determines that an embargo is unreasonable, a rail carrier may be liable for damages pursuant to 49 U.S.C. § 11704(b).

The shippers filed a complaint against AMR on March 21, 1994, seeking damages resulting from the embargo on the Norman Branch that were incurred from December 15, 1993, through April 15, 1994. In March of 1997, the Board rejected the claims for damages, finding that AMR had acted reasonably in suspending service after the washouts and that it was reasonable for AMR not to repair the line.

On petition for review, we reversed the Board's decision regarding the reasonableness of AMR's actions. GS Roofing I, 143 F.3d at 392. Although we agreed with the Board that the initial embargo on the line was reasonable in light of the flooding and washouts, we concluded that AMR's failure to repair the track was unreasonable and that AMR was accordingly liable to the shippers for damages. Id. at 394-95. We therefore remanded the case so that the Board might calculate the amount of damages owed to the shippers.

On remand, the Board concluded that AMR was liable for damages that occurred from December 24, 1993, the date that AMR should have resumed service on the Norman Branch, through April 15, 1994, when Caddo Antoine began providing service on the line. Although the shippers sought damages totaling $707,278.41, plus interest,

the Board determined, <u>inter</u> <u>alia</u>, that claims for lost profits were too speculative and that it had no authority to award compensation for attorney fees. The Board accordingly limited damages to those related to alternate transportation utilized during the embargo and the cost of the construction of an interim loading facility. Specifically, the Board awarded $121,247.60, plus interest, to Bean Lumber, and $71,316.90, plus interest, to GS Roofing.

## II. DISCUSSION

### A. Standard of Review

Our scope of review in this matter is narrow. <u>GS Roofing I</u>, 143 F.3d at 391. We are required to give considerable deference to the Board's interpretation of the statutes and regulations it is entrusted to administer, <u>Nat'l Grain and Feed Ass'n v. United States</u>, 5 F.3d 306, 308-09 (8th Cir. 1993), and we will not disturb the Board's decision absent compelling indications that the Board's interpretations were incorrect. <u>Caddo Antoine</u>, 95 F.3d at 746. We may "ask only whether, in those cases in which Congress has not directly addressed the precise question at hand, the [Board's] action 'is based on a permissible construction of the statute.'" <u>Id.</u> (quoting <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 (1984)). Notwithstanding this narrow standard of review, we are nevertheless obligated to ensure that "proper legal standards were correctly applied." <u>City of Cherokee v. ICC</u>, 641 F.2d 1220, 1226-27 (8th Cir. 1981).

### B. The Feeder Line Case

Although AMR does not contest the Board's decision to force the sale of the Norman Branch, it petitions for review of the Board's calculation of the constitutional minimum value of the line. AMR argues that the Board violated 49 U.S.C. § 10907 by failing to calculate a GCV and instead setting the purchase price at NLV. From

AMR's perspective, the plain meaning of § 10907 requires the Board to calculate both a NLV and a GCV figure for a line. The Board was therefore obligated, AMR contends, to calculate GCV or to explicitly conclude that a line has a GCV of zero. Stated otherwise, AMR contends that the Board's obligation under the statute is to "find two values" and then "pick the highest." Because in this instance the Board simply concluded that there was insufficient evidence to demonstrate GCV, AMR argues we owe no deference to the Board's decision and that the purchase price of $961,096.24 must be set aside.

As previously discussed, 49 U.S.C. § 10907(b)(1) directs the Board to set the purchase price for the forced sale of a rail line at "not less than the constitutional minimum value," which is defined as "not less than the net liquidation value of such line or the going concern value of such line, whichever is greater," 49 U.S.C. § 10907(b)(2). Contrary to AMR's contentions, we conclude that the statute does not require the Board to calculate a GCV when the Board reasonably concludes, as it did in this case, that the evidence is insufficient to establish an accurate figure. Here, the Board reached this conclusion only after receiving two rounds of evidence on the constitutional minimum value of the Norman Branch. To require the Board to calculate GCV under these circumstances would either obligate the Board to base its GCV figure on unreliable evidence, which we are confident the statute does not require, or would obligate the Board to consider potentially endless submissions of unreliable evidence, a no more plausible procedure. We conclude that Congress intended neither of these alternatives and that 49 U.S.C. § 10907 therefore does not require the Board to calculate GCV when it concludes that the evidence is insufficient to enable it to do so. We have reviewed the Board's analysis of the valuation evidence, and we conclude that it acted reasonably in finding that the evidence was insufficient to establish a reliable GCV for the Norman Branch. We furthermore conclude that the Board's decision to establish the purchase price for the Norman Branch at the NLV of the entire line was entirely reasonable given the lack of evidence establishing GCV.

-11-

AMR also contends that the Board arbitrarily misapplied its traditional burden of proof rules in this case and that we must accordingly set aside the Board's purchase price. According to AMR, the Board's feeder line regulations and case law place the burden of proof on "all valuation issues" on the feeder line applicant. AMR therefore argues that Caddo Antoine bore the burden of producing evidence on the constitutional minimum value of the Norman Branch. AMR furthermore contends that because Caddo Antoine failed to satisfy its burden, the Board was obligated to utilize AMR's GCV values in determining the constitutional minimum value of the line.

In our view, the record supports the Board's contention that it does not, as a rule, impose upon the appellant the burden establishing the constitutional minimum value of a line, although we acknowledge that certain of the cases cited by AMR suggest that the Board may have done so in certain past situations. See, e.g. Cheney Railroad Co., 5 I.C.C.2d 250, 268 (1989) ("[v]aluation disputes are resolved according to the burden of proof. The burden is on the offeror as proponent of the relief requested."); Sandusky Co., 6 I.C.C.2d 568, 575 (1990) (applicant "has the burden of proof. . ."). It is clear, for example, that although the relevant statute requires that an applicant establish that "public convenience and necessity require or permit the sale of a particular railroad line," 49 U.S.C. § 10907(c)(2), it says nothing about the burden of proof in establishing the purchase price of the line. Furthermore, although the Board's regulations require that a feeder line applicant provide "a[n] estimate of the NLV and the GCV of the line and evidence in support of those estimates," 49 C.F.R. § 1151.3(a)(4), they do not explicitly assign the burden of proof in establishing GCV. To the contrary, the Board has made it clear that "applicants would be free to present any evidence that they deemed persuasive and that it would be inappropriate to delineate the types of evidence the parties should submit." PSI Energy, Inc., 7 I.C.C.2d 227, 230 (1991) (internal quotation omitted). Additionally, the Board has indicated that its regulations are not intended to "to force an applicant to develop its case according to a GCV basis which, according to the applicant, has no factual foundation in the case at hand." Id.

We likewise reject AMR's contention that, in light of Caddo Antoine's failure to produce evidence of GCV, the Board was obligated to adopt AMR's estimate of GCV. In support of this proposition, AMR relies on <u>Chicago and North Western Transportation Company</u>, 363 I.C.C. 956, 961 (1981), in which the Board stated that "where both offeror and offeree have submitted acceptable appraisals and where it is impossible to determine which valuation is more accurate, we shall accept the figure submitted by the offeree-railroad." In this case, however, the Board explicitly determined that the evidence of GCV submitted by AMR was insufficient and inaccurate, and thus unacceptable. We accordingly reject AMR's contention that the Board's prior cases require the Board to accept a GCV that it has determined to be deficient.

In sum, we accept the Board's representation that under its own precedent and policy the purchase price in feeder line proceeding is determined on a "case by case basis." The Board allows all parties to present evidence of NLV or GCV, and then bases the purchase price of the line on the evidence in the record as a whole.

In light of the foregoing, we find no error in the Board's valuation of the constitutional minimum value of the Norman Branch. The Board's order establishing the purchase price of the line at $961,096.24 is therefore affirmed.

## C. The Compensation Case

According to the Board's standard formula, the commercially reasonable value of trackage rights consists of the sum of three components: (1) the variable costs incurred by the owning carrier as a result of the tenant carrier's use of the owning carrier's track; (2) the tenant carrier's proportionate share of maintenance and operating expenses for the track being used; and (3) an interest or rental component that compensates the owning carrier for the tenant carrier's use of its capital dedicated to the track. <u>Arkansas & Missouri R.R. v. Missouri Pac. R.R.</u>, 6 I.C.C.2d 619, 622

-13-

(1990). The Board initially concluded that the proper application of this formula to trackage rights over the southern portion of the Norman Branch yielded a figure of $9.75 per car. On reconsideration, however, the Board lowered its figure to $7.00, the amount originally requested by AMR.

On petition for review, the shippers, Caddo Antoine, and East Texas Central challenge the Board's calculation of the compensation owed to AMR for overhead trackage rights on the southern part of the Norman Branch during the time period that AMR retained ownership of the portion of the Branch serving International Paper. At oral argument, the shippers and the railroads stated that they do not challenge the proper application of the Board's traditional formula for allocating trackage rights compensation. They contend, rather, that the Board utilized the incorrect figures in calculating the specific components of the test. Specifically, the they argue that the Board erred by relying on AMR's system-wide costs, rather than line-specific figures, in calculating AMR's variable costs and the maintenance and operation costs associated with the southern part of the line.

The Board concedes that it relied on AMR's 1994 and 1995 system average maintenance costs in its analysis, but contends that it was justified in doing so. According to the Board, the only available information on AMR's costs was evidence of 1994 and 1995 system average costs and 1993 data on costs related to the entire Norman Branch. The Board concluded that the system-wide data was the best evidence of record. In support of this proposition, the Board notes that it routinely utilizes system-wide data where line-specific data are unavailable. Furthermore, the Board concluded that, because AMR is a small carrier, its costs are likely similar across its system. The Board also expressed its concern that the 1993 cost data was not representative of 1994 cost figures. Finally, although the shippers criticized AMR's cost evidence, the Board argues that they failed to produce their own evidence on AMR's costs associated with the southern portion of the Norman Branch.

We cannot say that the Board's decision was unreasonable, although we believe, as the Board acknowledges, that the use of line-specific data on AMR's costs would have preferable to system-wide cost data. In light of the Board's conclusion that no such evidence was available, however, and keeping in mind the level of deference that we owe the Board in these matters, we conclude that the Board did not act arbitrarily or capriciously by relying on system-wide costs. We further conclude that, in light of AMR's original request, the Board acted reasonably in lowering the trackage rights compensation rate to $7.00 per car.

Finally, the shippers also argue that the Board erred in including a rental component in its calculation of the proper compensation for trackage rights over the southern three-mile portion of the line. They argue, in short, that the inclusion of a rental component in the formula serves to compensate AMR for its illegal embargo on the Norman Branch, and that this violates public policy. In light of the shippers' concession that they are not challenging the method utilized by the Board to calculate trackage rights compensation, we are unsure if this challenge to the inclusion of a rental component in the formula has been withdrawn. Assuming that it has not, we reject it. The Board has separately addressed the issue of damages incurred as a result of AMR's unlawful embargo. Furthermore, according to the Board's representation, the $7.00 figure ultimately arrived at by the Board does not include a rental component. Moreover, even if it did, we conclude that the Board acted reasonably and in line with its precedent by including the rental component in its calculation of the commercially reasonable rate of compensation for trackage rights over the southern tip of the Norman Branch. See Gibbons v. United States, 660 F.2d 225, 231-33 (7th Cir. 1981).

We accordingly affirm the Board's order setting compensation for trackage rights over the southern three miles of the Norman Branch at $7.00 per car.

## D.  The Damages Case

The shippers petition for review of the Board's award of $192,564.50 in damages to Bean Lumber and GS Roofing.  They argue that the Board erred by failing to award lost profits related to two contracts entered into by GS Roofing and by denying the request of the shippers for damages in the form of attorney fees.

The shippers first argue that GS Roofing is entitled to recover profits in the amount of approximately $240,975 that it would have earned, absent AMR's embargo, pursuant to a contract with Celotex Corporation.  The shippers contend that on December 24, 1993, the date that AMR's embargo on the Norman Branch became illegal, GS Roofing had a fixed-price contract with Celotex whereby GS Roofing agreed to ship between 20,000 and 25,000 tons of granules to Celotex's Houston, Texas, facility.  The shippers further contend that GS Roofing was forced to cancel the Celotex contract solely because of AMR's embargo, that AMR was aware of the existence of the contract, and that substitute truck transportation was infeasible and unavailable.

The Board concedes that it possesses the authority to award damages for lost profits, see Louisiana Railcar, Inc. v. Missouri Pacific Railroad Co., 5 I.C.C.2d 542, 549 (1989), but it defends its decision to deny GS Roofing's claim on the ground that it is "speculative and remote."  The Board noted in its order that it was uncertain whether the agreement between GS Roofing and Celotex had ripened into a contract by the time AMR instituted the embargo.  The Board also observed that it would have been practical for GS Roofing to utilize trucks to transport the granules to Houston, thereby mitigating its damages, that AMR was not responsible for the alleged limited availability of truck transportation, and that there was no "independent verification" of the terms and of the existence of the Celotex contract.  Although the Board did not question the existence of the contract in the proceedings below, the Board now

suggests that there is no evidence that Celotex ever accepted GS Roofing's offer to ship the granules to Houston.

Notwithstanding our limited scope of review, we conclude that there are compelling indications that the Board erred in rejecting GS Roofing's claim for lost profits. See Caddo Antoine, 95 F.3d at 746. The record contains a copy of the letter from GS Roofing to Celotex offering to deliver the granules and specifying both price and quantity. In our view, and especially in light of the industry contracting practice as described by the shippers, the record supports GS Roofing's contention that it had entered into a contract to ship a specified amount of granules to Celotex's Houston facility. In light of the distance that the granules were to be shipped and the financial consequences associated with transporting the granules via truck, the Board's conclusion that truck transportation was a viable and available alternative for GS Roofing is lacking in support.

Although we agree with the Board that damages in the form of lost profits are difficult to establish, we nevertheless conclude that in this case GS Roofing has carried its burden with relation to the Celotex contract. In short, there is nothing overly speculative or remote about GS Roofing's claim: the volume of granules under the contract is known, the price was established, and GS Roofing provided evidence of its production costs. The record also supports the shippers' contention that GS Roofing would have fulfilled its obligation under the contract in the absence of AMR's unlawful embargo. We accordingly conclude that the Board erred by rejecting GS Roofing's complaint for damages for lost profits related to the Celotex contract. Because we are ill-equipped to address the question of the specific amount of damages due under the contract, however, we remand the issue so that the Board may do so.

The shippers also challenge the Board's failure to award GS Roofing damages for lost profits under a contract to supply colored stone dust to Koch Oil's Fontana, California, facility. Although GS Roofing eventually shipped the order to Koch, it

argues, essentially, that in the absence of the embargo it would have shipped additional product. Although GS Roofing's claim is not without some persuasiveness, we conclude that the Board acted reasonably in denying it. Unlike the complaint for damages under the Celotex contract, GS Roofing has failed to produce specific evidence on the profits it lost on the colored stone contract. We agree with the Board, therefore, that "an assertion without specifics" that more product would have shipped is insufficient to establish damages for lost profits.

Finally, the shippers argue that the Board erred by failing to award damages for the attorney fees incurred by the shippers. Although the shippers concede that there is no authority suggesting that the Board has the power to do so, they argue that the attorney fees incurred in an attempt to mitigate damages are no different than other expenses and that the Board has broad power to award damages for any expenses related to mitigation attempts. The Board argues that it is does not possess the power to award attorney fees, see CF Industries, Inc. v. Koch Pipeline Co., STB Docket No. 41685 (STB served May 9, 2000), slip op. at 2 n.2 ("we have no authority to award attorney's fees"), and that the bulk of the legal fees incurred by the shippers was not the result of their attempts to mitigate damages.

Without categorically holding that the Board lacks authority to award attorney fees, we conclude that the Board acted reasonably in denying legal fees in this case. As the shippers concede, there is no authority requiring the Board to award legal fees, and it has not done so in the past. Furthermore, we cannot say that the Board's conclusion that the bulk of the attorney fees incurred by the shippers was not related to mitigation is unreasonable. Likewise, we cannot say that the Board erred in rejecting the shippers' claims for additional miscellaneous expenses.

The Board's award of damages is affirmed in part. We reverse the Board's denial of damages for lost profits related to the Celotex contract, however, and remand for a calculation of the amount of those damages.

## III. CONCLUSION

The order of the Board in the feeder line case, requiring the sale of the Norman Branch and setting the purchase price at $961,096.24, is affirmed. The Board's order in the compensation case, setting the price of overhead trackage rights at $7.00 per car, is affirmed. Finally, the Board's order in the damages case is affirmed in part, reversed in part, and the case is remanded to the Board for an award of appropriate damages related to GS Roofing's contract with Celotex.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.